Rumela Roy (*pro hac vice* forthcoming)
EARTHJUSTICE
633 17th Street, Suite 1600
Denver, CO 80202
T: 303-996-9623
E: rroy@earthjustice.org

Andrea A. Treece (*pro hac vice* forthcoming)
EARTHJUSTICE
50 California Street, Suite 500
San Francisco, CA 94111
T: 415-217-2000
E: atreece@earthjustice.org

*Attorneys for Plaintiff Oceana, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| OCEANA, INC., | |
| *Plaintiff,* | Case No.  3:24-cv-00179 |
| v. | |
| NATIONAL MARINE FISHERIES SERVICE, 1315 East-West Highway Silver Spring, MD 20910, | |
| *Defendants.* | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
## (5 U.S.C. § 552)

**INTRODUCTION**

1.    Plaintiff Oceana, Inc. ("Oceana"), a not-for-profit international advocacy organization dedicated to ocean conservation, brings this action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, to compel Defendant the National Marine Fisheries Service ("Fisheries Service") to release agency records related to the take of marine mammals in North Pacific groundfish fisheries.

2.    North Pacific groundfish fisheries, particularly groundfish trawl fisheries, capture federally protected marine mammals—including whales, dolphins, porpoises, seals, and sea lions—in their fishing nets and gear on a routine basis. Most of these entangled animals die or suffer serious injury (i.e., injury that would likely result in death). This catch of marine mammals (as well as catch of other animals not targeted by the fishery) during fishing operations is called "bycatch." Bycatch puts the conservation and recovery of marine mammals as well as the health of ocean ecosystems at risk.

3.    In recent years, the Fisheries Service has reported an uptick in the number of orcas that are caught by North Pacific groundfish trawl fisheries operating in the Bering Sea and Aleutian Islands off Alaska. The agency reported that, in 2023, these fisheries caught ten orcas withing a span of only four months. All but one of the orcas were dead, and the only orca released alive was seriously injured.

4.    The Fisheries Service is the federal agency responsible for managing North Pacific groundfish fisheries and protecting a variety of marine mammal species in Alaska. From 2021 to 2023, Oceana filed three FOIA requests with the Fisheries Service, seeking photos, videos, and other records on marine mammal bycatch, including orca

2

bycatch, in North Pacific groundfish fisheries. The records sought are related to Oceana's advocacy and public education missions to protect marine life and ecosystems from unsustainable fishing operations. Oceana plans to disseminate the requested records in order to educate the public about the harmful effects that trawl gear used in federally managed fisheries has on marine mammals and the need for better management of such fisheries in Alaska.

5.     In response to the requests, the Fisheries Service provided Oceana with photos and other agency records. But many of the photos were so heavily redacted that they distorted the images and rendered the marine mammal bycatch shown virtually unrecognizable. *See* Figures 3–11 below. The redactions removed all information that would help viewers understand the relationship between marine mammal bycatch and the industrial fishing operations that caused the bycatch, thereby stripping the records of their effectiveness in Oceana's public education campaigns and undercutting the very reason that Oceana sought the records. The Fisheries Service also redacted key information from other records, such as information about the location of the takes, preventing Oceana from being able to fully understand and analyze the realities of marine mammal bycatch in Alaska.

6.     The Fisheries Service's redactions unlawfully deprive Oceana—and the public—of important information regarding the agency's management of North Pacific groundfish fisheries and the trawl industry's harmful effects on marine mammal species. Congress enacted FOIA to advance government transparency and accountability by conferring upon the public a right to access federal agency information. As such, FOIA

requires federal agencies to release all requested agency records that are not otherwise specifically exempted from disclosure by the statute. Here, the Fisheries Service violated FOIA by withholding information that is not lawfully exempt.

7. Oceana has exhausted its administrative remedies with the Fisheries Service and now turns to this Court to enforce FOIA's guarantee of public access to agency records and remedy the agency's withholding of the requested information. Oceana respectfully asks this Court to declare the Fisheries Service's withholding unlawful and order the agency to immediately provide Oceana with all non-exempt records in unredacted form and all reasonably segregable portions of any lawfully exempt records that are responsive to the FOIA requests.

## JURISDICTION AND VENUE

8. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) and 5 U.S.C. § 552(a)(4)(B) (FOIA).

9. Venue properly vests in this District pursuant to 5 U.S.C. § 552(a)(4)(B) because the agency records sought by Oceana are situated in this District.

10. This Court has authority to grant Oceana's requested relief pursuant to FOIA, 5 U.S.C. § 552(a)(4)(B), (E), and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202.

## PARTIES

11. Plaintiff OCEANA, INC. is a not-for-profit international advocacy organization dedicated to protecting and restoring the world's oceans, including the North Pacific Ocean basin, through public education, policy, advocacy, science, and law.

Oceana's mission includes ensuring the protection of marine mammals and advocating for the sound management of U.S. fisheries. Oceana devotes considerable resources to studying and publicly communicating the ecological and economic importance of sound management of North Pacific fisheries and conservation of North Pacific marine species and ecosystems. Oceana monitors agency compliance with laws related to North Pacific species and ecosystems, and Oceana advocates for policies and practices to advance protections for such species and ecosystems. Oceana regularly educates its supporters, members, and the public on issues relevant to protecting and conserving North Pacific species and ecosystems. Oceana cannot fully achieve its organizational purposes without access to information regarding North Pacific groundfish fisheries' effects on marine mammals. Oceana has over 1,028,904 members nationally, including 4,812 members in Alaska. Oceana maintains an office in Juneau, Alaska.

12.     Defendant NATIONAL MARINE FISHERIES SERVICE is the federal agency within the U.S. Department of Commerce's National Oceanic and Atmospheric Administration with responsibility for managing, conserving, and protecting living marine resources within 200 nautical miles of the United States coast. The Fisheries Service is responsible for the protection of marine mammals such as whales, dolphins, porpoises, seals, and sea lions under the Marine Mammal Protection Act ("MMPA"). The Fisheries Service is also the federal agency with primary responsibility to ensure that the requirements of the Magnuson-Stevens Fishery Conservation and Management Act ("Magnuson-Stevens Act" or "MSA") are followed and enforced. The Fisheries Service is also responsible for the protection, conservation, and recovery of most endangered and

5

threatened marine species under the Endangered Species Act ("ESA"). The Fisheries Service is in possession and control of the records that Oceana seeks.

## STATUTORY BACKGROUND

### I.     FREEDOM OF INFORMATION ACT

13.     Enacted in 1966, FOIA was designed to protect "the citizens' right to be informed about what their government is up to." *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 773 (1989) (internal quotations omitted). "The basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *Nat'l Labor Relations Bd. v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978). The statute was intended "to permit access to official information long shielded unnecessarily from public view and . . . to create a judicially enforceable public right to secure such information from possibly unwilling official hands." *Env't. Prot. Agency v. Mink*, 410 U.S. 73, 80 (1973).

14.     FOIA requires that "each agency . . . shall make . . . records promptly available to any person" upon receipt of a request, unless certain narrow exemptions to disclosure apply. 5 U.S.C. § 552(a)(3)(A). The agency bears the burden of establishing the applicability of each exemption as to each record for which it is claimed. *See id.* § 552(a)(4)(B); *Lahr v. Nat'l Transp. Safety Bd.*, 569 F.3d 964, 973 (9th Cir. 2009) ("FOIA's strong presumption in favor of disclosure means that an agency that invokes one of the statutory exemptions to justify the withholding of any requested documents or portions of documents bears the burden of demonstrating that the exemption properly

applies to the documents." (internal quotations omitted)).

15.     To meet this burden, the agency must offer oral testimony or detailed
affidavits to justify the exemptions claimed. *Mink*, 410 U.S. at 93. "The description and
explanation the agency offers [to justify the exemptions] should reveal as much detail as
possible as to the nature of the document," in order to provide "the requestor with a
realistic opportunity to challenge the agency's decision." *Oglesby v. U.S. Dep't of Army*,
79 F.3d 1172, 1176 (D.C. Cir. 1996). Affidavits must be "detailed enough to allow the
court to make an independent assessment of the government's claim." *Lane v. Dep't of
Interior*, 523 F.3d 1128, 1135 (9th Cir. 2008).

16.     When a requested document contains some information which falls under
one of the exemptions, FOIA requires that all non-exempt portions of the record be
released. FOIA expressly mandates that any "reasonably segregable portion" of a record
must be disclosed to a requester after exempt parts of the record are redacted. 5 U.S.C. §
552(b).

17.     FOIA contains a total of nine exemptions. Exemption 3 authorizes an
agency to withhold information if another statute specifically prohibits its disclosure. *Id.*
§ 552(b)(3). If the other statute in question was enacted before the enactment of the
OPEN FOIA Act of 2009, Exemption 3 only applies if the other statute "requires that the
matters be withheld from the public in such a manner as to leave no discretion on the
issue" or "establishes particular criteria for withholding or refers to particular types of
matters to be withheld." *Id.* Any statutes enacted after the enactment of the OPEN FOIA
Act of 2009 must specifically cite to 5 U.S.C. § 552(b)(3) for Exemption 3 to apply.

18.     Exemption 7 authorizes the withholding of records or information compiled for "law enforcement purposes, but only to the extent that the production of such law enforcement records or information (A) could reasonably be expected to interfere with enforcement proceedings, (B) would deprive a person of a right to a fair trial or an impartial adjudication, (C) could reasonably be expected to constitute an unwarranted invasion of personal privacy, (D) could reasonably be expected to disclose the identity of a confidential source, . . . (E) would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law, or (F) could reasonably be expected to endanger the life or physical safety of any individual." *Id.* § 552(b)(7).

19.     FOIA requires federal agencies to determine within twenty working days after the receipt of a FOIA request whether to comply with such request and to immediately notify the requestor of "such determination and the reasons therefor" and "the right of such person to seek assistance from the FOIA Public liaison of the agency." *Id.* § 552(a)(6)(A). In the case of an adverse determination, federal agencies must notify the requestor of its right to appeal and the right to seek dispute resolution services. *Id.* § 552(a)(6)(A)(i).

20.     When an administrative appeal is filed, the agency must respond to the appeal within twenty working days. *Id.* § 552(a)(6)(A)(ii).

21.     An agency's failure to comply with any deadlines to respond to a requester's FOIA requests and appeals satisfies the requester's requirement to exhaust

8

administrative remedies. *Id.* § 552(a)(6)(C)(i).

22.     FOIA provides this Court with jurisdiction to enjoin federal agencies "from withholding agency records and to order the production of any such records improperly withheld from" the requester. *Id.* § 552(a)(4)(B).

## II.     MAGNUSON-STEVENS FISHERY CONSERVATION AND MANAGEMENT ACT

23.     The MSA governs the conservation and management of fisheries in U.S. territorial waters and in the exclusive economic zone, which extends from the boundaries of state waters (typically three nautical miles from shore) to 200 nautical miles offshore or to an international boundary with neighboring countries. 16 U.S.C. §§ 1801(b)(1), 1802(11). The Fisheries Service is responsible for implementing and administering the MSA pursuant to authority delegated to the agency by the Secretary of Commerce.

24.     In enacting the MSA, Congress recognized the importance of "sound management" of U.S. fisheries "to prevent overfishing, to rebuild overfished stocks, to insure conservation, to facilitate long-term protection of essential fish habitats, and to realize the full potential of the Nation's fishery resources." *Id.* § 1801(a)(5), (6). The MSA requires the Fisheries Service to conserve not only target species but also non-target species and the health of marine ecosystems. For example, the MSA's National Standard 9 requires that conservation and management measures in fishery management plans and regulations, "to the extent practicable, (A) minimize bycatch and (B) to the extent bycatch cannot be avoided, minimize the mortality of such bycatch." *Id.* § 1851(a)(9); *see also id.* § 1853(a)(11). "Conservation and management measures" refers

9

to measures "(A) which are required to rebuild, restore, or maintain, and which are useful in rebuilding, restoring, or maintaining, any fishery resource and the marine environment and (B) which are designed to assure that, [among other things,] . . . irreversible or long-term adverse effects on fishery resources and the marine environment are avoided." *Id.* § 1802(5).

25.     The MSA also requires fishery management plans and regulations to be consistent with other applicable law, including the MMPA and ESA. *Id*. § 1854(a)(1), (b)(1), (c)(1).

26.     The MSA is built on the principle that the public must be able to participate meaningfully in fisheries management. *Id.* § 1801(b)(5) (purpose of the MSA includes enabling "consumer and environmental organizations, and other interested persons to participate in, and advise on," fisheries conservation and management processes), (c)(3) (policy of the MSA includes "involv[ing], and [being] responsive to the needs of, interested and affected . . . citizens" and "draw[ing] upon . . . academic capabilities in carrying out research, administration, management, and enforcement").

27.     The MSA recognizes that fisheries information is critical for fisheries management. *Id.* § 1801(a)(8) ("The collection of reliable data is essential to the effective conservation, management, and scientific understanding of the fishery resources of the United States."). As such, the agency collects fisheries information through mechanisms such as direct reporting requirements under the MSA. The agency also collects fisheries information through observer programs. The MSA provides that vessels may be required to carry observers "for the purpose of collecting data necessary for the conservation and

management of the fishery." *Id.* § 1853(b)(8); *see id.* § 1802(31) (defining an "observer" as "any person required or authorized to be carried on a vessel for conservation and management purposes"). The MSA defines "observer information" as "any information collected, observed, retrieved, or created by an observer or electronic monitoring system pursuant to authorization by the Secretary, or collected as part of a cooperative research initiative . . . ." *Id.* § 1802(32).

28.     The MSA sets forth confidentiality requirements for (1) certain information submitted to the Fisheries Service by any person in compliance with requirements under the statute and (2) certain observer information. *Id.* § 1881a(b). But the MSA provides a variety of exceptions to these confidentiality requirements. *Id.*

29.     For example, the MSA provides that information submitted by any person in compliance with MSA requirements is not confidential and may be disclosed if the person that submits that reported information consents to the information's release. *Id.* § 1881a(b)(1)(F).

30.     Observer information is also not confidential and may be disclosed if the submitter of the observer information consents to its release. *Id.* § 1881a(b)(1)(F), (b)(2).

31.     The MSA also authorizes the Fisheries Service to disclose information that is subject to the statute's confidentiality requirements in "any aggregate or summary form which does not directly or indirectly disclose the identity or business of any person who submits such information." *Id.* § 1881a(b)(3).

32.     Moreover, observer and reported information related to take of marine mammals is generally not confidential under the MSA. *See infra* ¶¶ 37–39. The Fisheries

11

Service has long recognized that the MSA allows the release of information related to take of marine mammals—including the names and description of the fishery; the species of each marine mammal killed or injured by the fishery; the date, time, and geographic location of the take; and non-proprietary information regarding fishing practices and gear used in the take—to the public.[1] Photos and videos that convey this information are therefore not confidential.

## III.    MARINE MAMMAL PROTECTION ACT

33.    Congress enacted the MMPA to address the concern that "certain species and population stocks of marine mammals are, or may be, in danger of extinction or depletion as a result of man's activities" and to help "protect[] and encourage[]" marine mammals "to develop to the greatest extent feasible." 16 U.S.C. § 1361(1), (6). Congress declared that "such species and population stocks should not be permitted to diminish beyond the point at which they cease to be a significant functioning element in the ecosystem of which they are a part." *Id.* § 1361(2).

34.    To further these objectives, the MMPA prohibits the taking of marine mammals, except in certain limited circumstances. *Id.* § 1371(a). "Take" means "to harass, hunt, capture, collect, or kill, or attempt to harass, hunt, capture, collect or kill, any marine mammal." *Id.* § 1362(13); 50 C.F.R. § 216.3.

35.    Section 118 of the MMPA governs the incidental taking of marine

---

[1] *See, e.g.*, Email from Ned Cyr, Dir., Off. of Sci. & Tech., Fisheries Service, to Fisheries Service Science Directors et al., Re: Data Aggregation and Summarization Guidelines (July 2, 2009) [hereinafter Cyr Email].

mammals during commercial fishing operations, and it sets an immediate goal of reducing incidental marine mammal mortality or serious injury in the course of commercial fishing operations to insignificant levels (i.e., approaching a zero mortality and serious injury rate). 16 U.S.C. § 1387(a)–(b).

36.     The Fisheries Service is responsible for protecting cetaceans (whales, dolphins, and porpoises) and pinnipeds other than walruses (seals and sea lions) under the MMPA. Among other things, the MMPA requires the Fisheries Service to: prevent the depletion of marine mammals from incidental take by commercial fisheries; prepare stock assessments for marine mammal stocks (which must include descriptions of commercial fisheries' take of stocks); publish an annual list of commercial fisheries, with the fisheries classified based on their risk of taking marine mammals; and develop and implement take reduction plans for each strategic stock of marine mammals, including any species listed under the ESA. *Id.* §§ 1386(a), 1387(c), (f).[2]

37.     Under the MMPA, regulated entities are subject to various monitoring, reporting, and recordkeeping requirements. For example, the MMPA requires fisheries to report all incidental mortality and injury of marine mammals, including the species killed or injured and the date, time, and geographic location of such occurrence. *Id.* § 1387(e). The MMPA does not deem this information confidential. The Fisheries Service has long

_____

[2] The MMPA defines strategic stocks as marine mammal stocks (1) for which the level of direct human-caused mortality exceeds the potential biological removal level; (2) which, based on the best available scientific information, is declining and is likely to be listed under the ESA within the foreseeable future; or (3) which is listed under the ESA or designated as depleted under the MMPA. *Id.* § 1362(19).

recognized that this information is non-confidential under the MMPA and the MSA.[3]

38.     The MMPA also authorizes the Fisheries Service to deploy observers and collect observer information on marine mammal take. 16 U.S.C. § 1387(d). Only "proprietary" observer information is confidential under the MMPA. *Id.* § 1387(d)(8). The MMPA requires the Fisheries Service to "release or make public upon request any such [otherwise confidential] information in aggregate, summary, or other form which does not directly or indirectly disclose the identity or business of any person." *Id.* § 1387(d)(9).

39.     Moreover, information regarding marine mammal take must be made public in order to implement the MMPA's mandates. *See, e.g.*, *id.* § 1387(f)(6)(D) (take reduction teams under the MMPA are required to meet in public to develop take reduction plans). This information is often only available through observer information collected under the MSA and/or the MMPA. This observer information regarding take of marine mammals is thus non-confidential, as long as it does not reveal proprietary information. *Id.* § 1387(d)(8), (9).

## IV.     ENDANGERED SPECIES ACT

40.     In the face of the extinction crisis and widespread biodiversity loss, Congress enacted the ESA to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species." 16

---

[3] *See* Cyr email, *supra* note 1.

U.S.C. § 1531(b).

41.     The ESA's "language, history, and structure . . . indicate[] beyond doubt that Congress intended endangered species to be afforded the highest of priorities," with the intent to "halt and reverse the trend toward species extinction, whatever the cost." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 174, 184 (1978). Accordingly, Congress made a conscious choice to "give endangered species priority over the 'primary missions' of federal agencies." *Id.* at 185. Congress declared its policy "that all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of [the ESA]." 16 U.S.C. § 1531(c)(1).

42.     Congress defined "conservation" under the ESA as "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary." *Id.* § 1532(3).

43.     The ESA seeks to protect and recover imperiled species by first listing them as threatened or endangered based on certain enumerated statutory factors. *Id.* § 1533(a)(1)(A)–(E); *see id.* § 1532(6), (20). The ESA also requires the designation of critical habitat for threatened and endangered species to protect the areas essential to the species' conservation. *Id.* § 1533(a)(3)(A)(i); *see id.* § 1532(5).

44.     The ESA requires agencies to ensure, through consultation with the U.S. Fish and Wildlife Service (for terrestrial species) and the Fisheries Service (for most marine species), that their actions are not likely to jeopardize the continued existence of

any endangered or threatened species or result in the destruction or adverse modification of the species' critical habitat. *Id.* § 1536(a)(2). During consultation, the Fisheries Service must use "the best scientific and commercial data available" to develop a variety of public documents such as biological assessments, biological opinions, and incidental take statements required by the ESA. *See, e.g.*, *id.* § 1536(a)(2), (c)(1); 50 C.F.R. § 402.14(d), (g)(8). These public documents must include information and findings regarding the proposed action's impact on the listed species and critical habitat.

45. The ESA also requires the Fisheries Service to prepare and implement recovery plans for the conservation and recovery of ESA-listed species. 16 U.S.C. § 1533(f)(1). The Fisheries Service must provide opportunities to the public for notice and comment prior to final approval of such plans. *Id.* § 1533(f)(4). Meaningful public participation requires access to information on listed species.

46. The ESA allows any person to bring citizen suits to enforce violations of the ESA and its regulations. *Id.* § 1540(g). Such citizen suits often must rely on public information provided by the Fisheries Service and the U.S. Fish and Wildlife Service regarding listed species and their critical habitat.

47. Thus, in order to implement the ESA's mandates, information about take of threatened and endangered marine species must be made public. *See, e.g.*, *id.* §§ 1533(f), 1536(a)(2), (c)(1), 1540(g); 50 C.F.R. § 402.14(d), (g)(8). This information is often only available through observer information collected under the ESA, MSA, or MMPA. This observer information regarding take of threatened and endangered species is therefore non-confidential.

16

## STATEMENT OF FACTS

### I.  BYCATCH OF MARINE MAMMALS IN THE NORTH PACIFIC

48.     The North Pacific ecosystem, which is one of the most productive ecosystems in the world, supports a variety of marine mammals such as dolphins, porpoises, whales, seals, sea lions, walruses, and sea otters.

49.     Although marine mammals are federally protected under the MMPA, they still face major threats from human activities, including fishing. The Fisheries Service's data shows that, between 2016 and 2020, almost 750 Alaska marine mammals experienced human-caused mortality or serious injury (i.e., any injury that will likely result in mortality).[4] Industrial fishing operations in the North Pacific caused a large majority of these deaths and serious injuries, often by capturing the marine mammals as bycatch in fishing nets and gear.

50.     Of the fisheries operating in the North Pacific, groundfish trawl fisheries are particularly harmful because they regularly catch and kill marine mammals, as well as other non-target species.

51.     Trawling is one of the most damaging and least sustainable fishing methods. It is a non-selective fishing technique in which large boats drag enormous nets on or near the ocean floor, scooping up almost everything they encounter, including protected marine mammals.

---

[4] J.C. Freed et al., *Human-Caused Mortality and Injury of NMFS-managed Alaska Marine Mammal Stocks, 2016-2020*, at 6–7 (Aug. 2022), https://repository.library.noaa.gov/view/noaa/44638.

52.     The Fisheries Service gathers information on marine mammal bycatch in the North Pacific groundfish trawl fisheries through both observer information and reported information. Photos and videos of marine mammal bycatch are usually created and collected by observers. Observer information is key for assessing the status of protected species and fish stocks and ensuring the Fisheries Service's compliance with its management, conservation, and protection obligations. For example, photos and videos created and collected by observers provide specific details regarding fishing practices and the gear involved, the circumstances surrounding the bycatch, the nature and severity of the bycatch, and more—details that are critical for identifying or confirming the species caught as bycatch, analyzing fisheries' specific effects on marine mammals and other fish and wildlife, developing plans and mechanisms to support conservation and recovery, and providing the public with necessary information to understand fisheries' impacts on protected species and public resources.

53.     The Fisheries Service has designated groundfish trawl fisheries in the Bering Sea and Aleutian Islands as Category II fisheries under the MMPA, meaning that the agency has determined these fisheries cause occasional death or serious injury to marine mammals. 16 U.S.C. § 1387(c)(1). The Fisheries Service reports that these groundfish trawl fisheries have killed and injured humpback whales, gray whales, orcas, harbor porpoises, Pacific white-sided dolphins, bearded seals, harbor seals, Northern fur seals, ringed seals, ribbon seals, spotted seals, Steller sea lions, and walruses. Many of these species, such as Steller sea lions, humpback whales, bearded seals, and ringed seals, are not only federally protected under the MMPA but also listed as endangered or

18

threatened under the ESA.

54.     In recent years, groundfish trawl fisheries in the North Pacific have caught an alarming number of orcas. Trawl gear entanglements account for most of the reported orca entanglements in Alaska, and captured orcas have a very low chance of survival.[5] The Fisheries Service reported that trawl fisheries in the Bering Sea caught eight orcas from 2020 to 2022.[6] All but one of the orcas were dead, and the only one disentangled was seriously injured.

55.     Even more troubling, in 2023, the Fisheries Service reported that groundfish trawl fisheries operating in the Bering Sea and Aleutian Islands caught ten orcas within the span of only four months (May 6, 2023, to September 9, 2023).[7] Nine of the orcas were dead, six of which were determined to have been killed by fishing gear; the only one released alive was seriously injured.

56.     This bycatch far exceeds the Fisheries Service's outdated assumption that the trawl fisheries in the Bering Sea and Aleutian Islands take 0.6 orcas per year.[8]

---

[5] Fisheries Service, *Killer Whale Entanglements in Alaska Summary Report: 1991-2022*, at 14, NOAA Tech. Mem. NMFS-F/AKR-32 (Dec. 2023), https://media.fisheries.noaa.gov/2023-12/FINAL-Alaska-Killer-Whale-Entanglements-Tech-Memo.pdf.
[6] *Id.* at 16.
[7] *Cause of Death Determined for 11 Killer Whales Incidentally Caught in Fishing Gear in Alaska in 2023*, Fisheries Service (Dec. 1, 2023), https://www.fisheries.noaa.gov/feature-story/cause-death-determined-11-killer-whales-incidentally-caught-fishing-gear-alaska-2023.
[8] Fisheries Service, *Alaska Groundfish Fisheries Final Programmatic Supplemental Environmental Impact Statement* 3.8-71 (June 2004), https://www.fisheries.noaa.gov/resource/document/alaska-groundfish-fisheries-programmatic-supplemental-environmental-impact.

Moreover, groundfish trawler crews have reported an increase in the number of orcas present near their boats, suggesting that high levels of orca bycatch in North Pacific trawl fisheries may continue.[9]

## II.    OCEANA'S FOIA REQUESTS

57.    From 2021 to 2023, Oceana submitted three FOIA requests to the Fisheries Service, seeking agency records on take of marine mammals, including orcas, in North Pacific groundfish fisheries.

58.    Oceana sought these records in furtherance of its advocacy and public education missions to protect marine mammals from the impacts of industrial fishing. As Oceana explained in its requests, "Oceana is a public-interest organization whose core mission is to protect the marine environment, public resources, and human health. This includes monitoring government management of our marine waters, encouraging public participation in government processes, and enforcing applicable laws. The requested documents will undergo significant scientific and legal scrutiny by Oceana and these analyses will form the foundation for responding to the Fisheries Service's actions."

59.    In particular, the requested records will enable the organization to better understand the impacts of the federally managed North Pacific groundfish trawl fisheries on marine mammals, including orcas, and to educate the public on these impacts. Oceana's FOIA requests explained that the requested records will "further both [the]

---

[9] Groundfish Forum, *Statement on Unintentional Killer Whale Interactions*, https://alaskabeacon.com/wp-content/uploads/2023/09/GFF-Statement-on-KW-Interactions_27-Sep.pdf.

organization's and members' understanding of the management of marine life in North

Pacific fisheries, particularly trawl fisheries" and "help disclose the effects of the

groundfish trawl fishery and associated activities on marine life." Oceana's requests

further explained that the requested records are "necessary for the public to gain a

complete understanding of the impact of trawl gear on the ecosystem," including impacts

on protected species, bycatch species, and other public resources. Oceana also noted that

the requested records are "critical to assessing the government's actions in protecting

these public resources, and specifically, its compliance with various environmental and

natural resource management laws."

A.    **April 2021 FOIA Request No. DOC-NOAA-2021-001424 – Seeking Records of Human-Caused Serious Injury or Mortality of Marine Mammals in North Pacific Groundfish Trawl Fisheries**

60.    On April 30, 2021, Oceana submitted a FOIA request to the Fisheries

Service, seeking, among other things, "[p]hotos and/or video records of all documented

human-caused serious injury or mortality of marine mammals in the federal North Pacific

groundfish trawl fisheries from 2009 to present."[10]

---

[10] Oceana's FOIA request also sought: photos and/or video of the April 2020 incident of two orca whale takes in a North Pacific groundfish trawl fishery; photos and/or videos of cold-water corals and sponge, king crab, tanner crab, halibut, sablefish, and king salmon taken as bycatch in the Gulf of Alaska (as defined by the fishery management plan area) during federally managed commercial trawl fisheries from 2010 to present; and photos/and or video of federally managed commercial trawl fisheries interactions with walrus, polar bear, and sea otter from 2009 to present. Oceana agreed to revise the scope of this FOIA request to seek only (1) records of all documented human-caused serious injury and mortality of marine mammals in the North Pacific groundfish trawl fishery and (2) 100 of the most recent photos and/or videos of each of the following groups: cold water corals and sponges, king crab, tanner crab, halibut, sablefish, and king salmon taken during federally managed fisheries.

61.     On May 27, 2021, the Fisheries Service sent an initial response that included previously released photos of orca bycatch. These photos included some redactions using black-out polygons, a redaction method that the agency had often used in previous years to redact certain allegedly exempt information when releasing images of bycatch. *See, e.g.*, Figure 1 below. Because this method generally leaves the background imagery intact, this method allows the requester to view the image of the marine mammal in the context of industrial fishing operations. *See id.*

62.     After several meetings with the Fisheries Service, Oceana and the agency agreed on a revised scope of the FOIA request in August 2021. Oceana and the Fisheries Service agreed that the agency's review and release of records of marine mammal bycatch would (1) exclude previously dead marine mammals; (2) include photos of animals with injuries or those that were killed by gear, including photos of body parts (e.g., flippers); and (3) will not include photos taken after biological specimens (tissue samples, snouts, skulls) were collected from the animal. Oceana and the agency agreed that "[i]mages, including metadata, will be reviewed for confidential information (e.g., vessel name, crewmember faces, etc.) before being released."

63.     Subsequently, the Fisheries Service made six releases of responsive records. These releases included several unredacted photos of marine mammal take. *See* Figure 2 below.

64.     But the releases also included numerous heavily redacted photos—and this time, the agency employed a new pixelation redaction method instead of the previously-used black-out polygon redaction method. The new pixelation method removed far more

information than is typically redacted when using the black-out polygon method.

65. In many instances, the Fisheries Service pixelated everything in the photo except the animal, meaning that all information necessary for viewers to understand the relationship between the bycatch and the fishing operations that caused it were removed. Even information about the gear that the animal was tangled in or injured by was removed. In several images, the pixelation method distorted the image such that the animal shown was practically unrecognizable. *See* Figures 3–6 below.

66. The Fisheries Service asserted that the redactions protected information exempt from disclosure under FOIA Exemption 3, claiming that the redactions were necessary to comply with the MSA's confidentiality provisions.



**Figure 1.** Photo released under FOIA Request No. DOC-NOAA-2021-001424, showing an orca on the deck of a fishing vessel in mixed catch with certain information redacted with black-out polygons.



**Figure 2.** Photo released under FOIA Request No. DOC-NOAA-2021-001424, showing a bearded seal on the deck of a vessel with fishing gear. The Fisheries Service made no redactions to this photo.



**Figures 3 to 6.** Photos released under FOIA Request No. DOC-NOAA-2021-001424, showing various marine mammals with all additional information and background redacted using a pixelation method.

67. Oceana requested that the agency reconsider these redactions. Oceana explained that several photos "have the background and even the parts of the animal distorted to the point you can hardly tell what is depicted." Upon the Fisheries Service's invitation to provide a list of photographs for reconsideration, Oceana provided the agency with a folder of overly redacted photos on February 15, 2022. Oceana again submitted other examples of overly redacted photos to the agency on September 8, 2022.

68. On September 27, 2022, the Fisheries Service denied Oceana's reconsideration request. The Fisheries Service again claimed that the images were

redacted "in order to comply with [the] Magnuson-Stevens Fishery Conservation and Management Act." The Fisheries Service stated that "[d]isclosing visual information such as a vessel's deck or factory configuration, images of crew or observers, and observer sample station layouts, could directly or indirectly disclose the identity of the vessel or business" and claimed that redactions were used to protect confidential information.

69. However, the agency's justification for using the new pixelation method to redact information did not relate to a need to protect confidential information. Rather, the Fisheries Service claimed that "the size and scope" of Oceana's FOIA request "required" the agency to "take a new approach to redaction by pixelating the background of the original images rather than using the redaction method through Clearwell which blacks-out parts of an image or document." The Fisheries Service further claimed that "[p]ixelation allowed for the full image of the marine mammal to be released whereas black-out polygons would have redacted portions of the mammal."

70. On December 22, 2022, Oceana timely administratively appealed the Fisheries Service's FOIA determination regarding all responsive records where photos were released with pixelated backgrounds and without disclosing non-exempt information. Oceana pointed out that the agency's redactions were not based on the need to protect confidential information and are inconsistent with FOIA and the MSA. Oceana also pointed out that, even assuming an exemption applied to portions of the requested records, the Fisheries Service failed to reasonably segregate non-exempt information.

71. The Department of Commerce was required to respond to the appeal within twenty working days. 5 U.S.C. § 552(a)(6)(A)(ii). More than nine months after Oceana

25

filed its appeal, on October 4, 2023, the Department of Commerce denied the appeal.

**B.      October 2023 FOIA Request No. DOC-NOAA-2024-000025 – Seeking Photos and/or Videos of Orca Takes in Alaska Groundfish Fisheries**

72.     On October 13, 2023, Oceana submitted a FOIA request to the Fisheries Service, seeking "the release of any photos and/or videos of orca takes in Alaska groundfish fisheries from 2019 to present at the highest resolution available." The request asked that the agency include photos and/or videos that show the animals in the water, within the trawl net or other gear, in mixed catches, or on-deck with the background imagery visible so the viewer can determine the context and setting of the photo. Oceana requested that the photos and video be labeled with the name of the fishery, date, and finest-scale spatial location known including latitude and longitude.

73.     In response to this request, the Fisheries Service produced fifteen records on February 3, 2024. However, the agency withheld most of the information based on the assertion that it was subject to FOIA Exemption 3 because the MSA allegedly protects this information.

74.     As with its releases for Oceana's April 2021 FOIA request, the agency used the new pixelation method to heavily redact several of the released photos, rendering many of the images unrecognizable. In some photos, even the sky and water appear to have been redacted. *See* Figures 7–10 below. Other photos in the release, however, were released without redaction or with less redaction. None of the photos were labeled with the name of the fishery, date, or location as Oceana had requested.



**Figures 7 to 10.** Photos released under FOIA Request No. DOC-NOAA-2024-000025, showing various marine mammals with all additional information and background redacted using a pixelation method.

75.      On February 29, 2024, NMFS closed this request, stating that the agency was unable to locate any additional responsive records.

76.      On May 29, 2024, Oceana timely administratively appealed the Fisheries Service's FOIA determination regarding all responsive records where photos were released with pixelated backgrounds and without disclosing non-exempt information. Oceana pointed out that the agency's sweeping redactions were not based on any valid requirement to protect confidential information under the MSA and therefore are not consistent with FOIA, the MSA, and the MMPA. Oceana also pointed out that, even assuming an exemption applied to portions of the requested records, the Fisheries Service failed to reasonably segregate non-exempt information.

77.      The Department of Commerce was required to respond to the appeal within

twenty working days, by June 27, 2024. 5 U.S.C. § 552(a)(6)(A)(ii). More than five months have passed since then, and the Department of Commerce still has not issued a determination on this appeal.

## C.    October 2023 FOIA Request No. DOC-NOAA-2024-000011 – Seeking Records Associated with Orca Bycatch in Alaska Groundfish Fisheries

78.    On October 13, 2023, Oceana submitted another FOIA request to the Fisheries Service, seeking release of the following records associated with orca bycatch in Alaska fisheries: (1) records associated with the take of orcas in North Pacific groundfish fisheries from 2019 to present including the observer report, self-report, latitude/longitude coordinates of the take, identification of the fishery involved in the take, and the date and time of the reported take; (2) records identifying the stock(s) of orcas for the above described takes, if known, or how the take will be assigned to stock(s) in the absence of identifying information; and (3) records describing any genetic information collected that is related to the above described takes.

79.    In response, the Fisheries Service produced thirty-five records on February 3, 2024, and two records on April 15, 2024. The records included a fully redacted PDF file with eleven blacked-out pages. The Fisheries Service asserted that this document was redacted under FOIA Exemption 7, but the agency provided no description of the document or any other justification for invoking the exemption. The agency made no attempt to segregate the document.

80.    The released records also included several spreadsheets with information regarding fishery bycatch of orcas, and some of the information was redacted under

FOIA Exemption 3 on the asserted basis that the MSA protects this information. The records also included photos that were heavily redacted—using the same new pixelation method described above—under the same asserted basis. *See* Figure 11 below. Other photos in the release, however, were released without redaction.



**Figure 11.** Photo released under FOIA Request No. DOC-NOAA-2024-000011, showing an orca with all additional information and background redacted using a pixelation method.

81.     On July 15, 2024, Oceana timely administratively appealed the Fisheries Service's FOIA determination regarding all responsive records where photos and other documents were released without disclosing non-exempt information. Oceana pointed out that the agency's redactions were not based on the need to protect confidential information and are not consistent with FOIA, the MSA, and the MMPA. Oceana also pointed out that, even assuming an exemption applied to portions of the requested records, the Fisheries Service failed to reasonably segregate non-exempt information.

82.     The Department of Commerce was required to respond to the appeal within twenty working days, by August 12, 2024. 5 U.S.C. § 552(a)(6)(A)(ii). More than four

months have passed since then, and the Department of Commerce still has not issued a determination on this appeal.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION – Violation of the Freedom of Information Act, 5 U.S.C. § 552, for Failure to Disclose Responsive Records

83.     The allegations made in paragraphs 1–82 are realleged and incorporated by this reference.

84.     Under FOIA, Oceana has a statutory right to obtain all non-exempt records responsive to their FOIA requests. 5 U.S.C. § 552(a)(3)(A).

85.      The Fisheries Service violated FOIA by unlawfully withholding and redacting non-exempt records that are responsive to Oceana's FOIA requests. *Id.* The Fisheries Service's redactions are not based on any valid legal requirement to protect confidential information and are not consistent with FOIA, the MSA, and the MMPA.

86.     Under FOIA, the Fisheries Service bears the burden of establishing that its claimed exemptions apply to the records that it continues to withhold and redact. *Id.* § 552(a)(4)(B). Here, the Fisheries Service has not met the burden necessary to justify its withholding of records under the claimed FOIA Exemptions 3 and 7. The Fisheries Service also has not provided detailed descriptions and explanations for how the information withheld falls within the claimed exemptions, as the agency is required to provide under FOIA.

87.     Oceana has fully exhausted its administrative remedies as to this claim.

**SECOND CAUSE OF ACTION – Violation of the Freedom of Information Act, , 5 U.S.C. § 552, for Failure to Provide Reasonably Segregable Portions of Any Lawfully Exempt Records**

88.     The allegations made in paragraphs 1–87 are realleged and incorporated by this reference.

89.     Under FOIA, Oceana has a statutory right to reasonably segregable portions of any record that contains information that is subject to any of FOIA's exemptions. 5 U.S.C. § 552(b).

90.     The Fisheries Service violated FOIA by unlawfully withholding reasonably segregable portions of any lawfully exempt records that are responsive to Oceana's FOIA requests. *Id.* The Fisheries Service's overbroad redactions are not based on any valid legal requirement to protect confidential information and are not consistent with FOIA, the MSA, and the MMPA.

91.     Oceana has fully exhausted its administrative remedies as to this claim.

**REQUEST FOR RELIEF**

WHEREFORE, Oceana requests that this Court:

1.     Declare that the Fisheries Service has violated FOIA by failing to disclose in unredacted form all non-exempt records and the reasonably segregable portions of any lawfully exempt records that are responsive to Oceana's FOIA requests;

2.     Order the Fisheries Service to provide Oceana in unredacted form all non-exempt records and the reasonably segregable portions of any lawfully exempt records that are responsive to Oceana's FOIA requests, within ten days of this Court's order;

3.     Maintain jurisdiction over this action until the Fisheries Service is in

31

compliance with FOIA and every order of this Court;

4.      Award Oceana's litigation costs and reasonable attorneys' fees in this action; and

5.      Grant such other and further relief as the Court deems just and proper.

Respectfully submitted this 19th day of December, 2024.

/s/Rumela Roy
Rumela Roy (*pro hac vice* forthcoming)
EARTHJUSTICE
633 17th Street, Suite 1600
Denver, CO 80202
T: 303-996-9623
E: rroy@earthjustice.org

/s/Andrea A. Treece
Andrea A. Treece (*pro hac vice* forthcoming)
EARTHJUSTICE
50 California Street, Suite 500
San Francisco, CA 94111
T: 415-217-2000
E: atreece@earthjustice.org

*Attorneys for Plaintiff Oceana, Inc.*