MICHAEL J. HEYMAN
United States Attorney,

E. BRYAN WILSON
Assistant U.S. Attorney
Federal Building & U.S. Courthouse
222 West Seventh Avenue, #9, Room 253
Anchorage, Alaska 99513-7567
Phone: (907) 271-5071
Fax: (907) 271-2344
Email: bryan.wilson@usdoj.gov

Attorneys for Defendant

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| OCEANA, INC.,<br><br>                      Plaintiff,<br><br>vs.<br><br>NATIONAL MARINE FISHERIES SERVICE,<br><br>                      Defendant. | **REPLY IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 3:24-cv-00279-KFR |

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.    INTRODUCTION**

    The plain language of the Magnuson-Stevens Act (MSA)'s confidentiality provision states: "[a]ny observer information shall be confidential and shall not be disclosed ...." 16 U.S.C. § 1881a(b)(2). NOAA has consistently maintained that the MSA is a withholding statute under 5 U.S.C. § 552(b)(3) for purposes of the Freedom of Information Act

(FOIA). See 89 FR 102000, 102003 (Dec. 17, 2024). ("NMFS applies MSA section 402(b)(3) as the basis for FOIA Exemption Three, mandatory withholding authority."); 89 FR 17358, 17367 (March 11, 2024); 77 FR 30486, 30491 (May 23, 2012). It is uncontested that the records at issue in this case were collected by observers who were deployed under the authority of the MSA and funded entirely under the terms of the MSA. 50 C.F.R. §§ 679.50–.57. Therefore all observer information concerning fishery information, such as imagery of vessels, gear, and similar contextual elements, must be withheld from the relevant records in this case. 50 C.F.R. §§ 679.50–.57. Despite this, in an effort to reconcile various provisions of the MSA with those of the Marine Mammal Protection Act (MMPA), Defendant has still worked to release records in this case to the extent they are interpreted as being outside the definition of confidential information under the MSA by depicting the mammal that was the subject of the image. At the same time, Defendant complied with the MSA's requirements to protect confidential observer information, which is the focal issue of this case.

Indeed, Defendant has gone above and beyond its duty to respond to Plaintiff's request by creating a spreadsheet allowing Plaintiff to correlate the photographs that Plaintiff seeks with the detailed data and analysis on human-induced mortality and injury events that Defendant published along with its report on that topic. 2nd Ferdinand Declaration at ¶ 7. At the same time, and as required by the MSA, Defendant appropriately withheld imagery to avoid "directly or indirectly disclos[ing] the identity or business of any person," the same withholding that would be required of MMPA observer information. See 16 U.S.C. 1881a(b)(3); 16 U.S.C. 1387(d)(8) - (9). Defendants therefore

properly segregated the information related to these observers that is confidential under the MSA from the imagery of incidentally caught and deceased marine mammals to prevent the disclosure, directly or indirectly, of the identity or business of any person, which in this case includes the vessel, vessel owner, captain, crew members, and any observers. While Exemption 7(A) was properly used in order to withhold information compiled during the course of a law-enforcement investigation, the release of which could reasonably be expected to interfere with said ongoing investigation, Defendant has recently learned that the investigation is not proceeding, and will work to release this document with partial redactions for remaining protected information. Regardless, FOIA Exemption 3 was used appropriately in accordance with the values of open government and providing as much transparency as the law permits. Accordingly, Defendant respectfully requests that the Court grant its Motion for Summary Judgment (Dkt. 23) and deny Plaintiff's Cross-Motion for Summary Judgment (Dkt. 27).

## II. ARGUMENT

### A. Defendant Has Met Its Burden By Providing A Sufficient Level of Detail to Justify the Claimed Exemptions

An agency is entitled to summary judgment on the basis of an agency affidavit when the agency is able to "describe the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith," which is the case here. Military Audit Project v. Casey, 656 F.2d 724, 738 (D.C. Cir. 1981).

Defendant has provided a declaration (Dkt. 24) that sets forth detailed and logical justifications for its invocation of FOIA Exemption 3, satisfying the requirements that the agency describe its redactions' consistency with the purpose of FOIA. This declaration, authored and affirmed by Jennifer Ferdinand, Deputy Director of the Alaska Fisheries Science Center at NMFS, summarizes Defendant's response to Plaintiff's FOIA requests and explains the scope and logic of the redaction process being contested. As required by the MSA, Defendant withheld imagery to prevent the disclosure, directly or indirectly, of the identity or business of any person. See 16 U.S.C. § 1881a(b)(3). The declaration logically describes the reasoning behind the redactions in light of the particular risk of disclosure that exists in this case; the images sought depict not only the marine mammals that were the subject of the request, but also the features of the vessels and individuals operating them, the disclosure of which could reveal their identity and business, and this risk cannot otherwise be mitigated by aggregation or summarization. The limited number of vessels in the relevant fisheries further increases the risk of disclosure, showing the necessity of the redactions. See 2nd Ferdinand Declaration at ¶ 3-5. Even so, the released versions of the records at issue were still carefully tailored via manual use of Adobe Photoshop pixelation to leave as much information unredacted as possible, which, as the declaration describes, was the method that Defendant specifically determined was the most efficient and effective means of doing so. Following this declaration's representation of the well-reasoned and non-conclusory basis behind these redactions, it is clear that Defendant has shown its work and met its burden in justifying these withholdings.

Plaintiff asserts Defendant failed to meet its burden to justify its invocation of the FOIA exemption, but Defendant has articulated in numerous instances that the information withheld could result in a prohibited direct or indirect disclosure under the MSA. For example, in the spreadsheet publicly released along with a report on human-caused mortality and injury that Defendant publishes each year, Defendant identified that takes of marine mammals occurred in the Bering Sea flatfish fishery in 2022. See, e.g., row 42 of the spreadsheet attached to the 2024 report available here: https://www.fisheries.noaa.gov/resource/publication-database/human-caused-mortality-and-injury-nmfs-managed-alaska-marine-mammal. If the imagery released allowed the viewer to identify that the take occurred by a large vessel, or that the vessel involved fish processing on board, the viewer would be able to narrow down the options to the Amendment 80 sector[1] which has about 18 vessels, because only Amendment 80 vessels are permitted to fish flatfish in the Bering Sea and only 18 of them operated in 2022. 2nd Ferdinand Declaration at ¶ 4. Further narrowing or full identification may be a simple process of using publicly-available information such as existing databases of vessel location/date information from Automatic Identification System (AIS) information providers, and their convenient cross-referencing and imagery resources. 2nd Ferdinand Declaration at ¶ 8. If information containing the date of an incident is released alongside

---

[1] The Amendment 80 sector is a subset of the Bering Sea Aleutian Islands (BSAI) trawl sector. It is referred to as the Amendment 80 sector because it was established by Amendment 80 to the Fishery Management Plan for Groundfish of the BSAI Management Area. Amendment 80 created a limited access program, effectively granting the eligible participants exclusive privileges to target six non-pollock groundfish species.

latitude and longitude data, the AIS information would provide an easy reference to look up and identify the vessel without any ambiguity, rendering the confidentiality protections provided by the MSA ineffective.

In this way, Defendant has clearly identified the foreseeable harms and risks that would likely result from failing to uphold the requirements of the MSA in this case. Because Defendant has sufficiently explained and justified its claimed exemptions via its declaration, it has satisfied its legal burden to do so.

### B. Defendant Has Met Its Burden to Show that Exemption 3 Applies

#### 1. The MSA confidentiality provisions apply.

Plaintiff urges the Court to focus on the MMPA's confidentiality provisions and ignore those of the MSA, but Plaintiff fails to show that the MSA does not govern. Because the responsive records were taken by fishery observers and submitted under the MSA, that statute demands that agencies prevent the statutorily prohibited disclosure of the identity or business of the vessel owner, the captain, crew, or observer. The withheld imagery depicts portions of fishing vessels, fishing gear, fishing decks, individuals, and the clothing they wore while on board, items that could be used to directly or indirectly identify a person or business, and which therefore must be withheld under the statutory requirements of the MSA. See Ferdinand Declaration at 34-38 (Dkt. 24).

As a preliminary matter, with respect to the redacted materials in this case, both the MSA and MMPA contain the same mandate prohibiting the redacted information and imagery in these records from being released to the public. That is, each statute provides that Defendant may release or make public certain information, but only in aggregate or

summary form, and in such a way that does not directly or indirectly disclose the identity or business of any person. See 16 U.S.C. 1881a(b)(3); 16 U.S.C. § 1387(d)(9).

While Plaintiff seeks to minimize MMPA confidentiality by restricting the definition of "proprietary information," it goes against its own plain meaning argument to do so. As Plaintiff notes, MMPA regulations describe, but do not directly define this term. 50 C.F.R. § 229.11(a) (noting a type of information included in the definition). The dictionary definition ("[i]nformation to which the owner has a protectable interest") is broadly inclusive. Commercial fishermen certainly have protectable interests in imagery and information from their vessel that could result in public identification of their vessels and crew, reveal fishing methods and practices, and enable harassment, which the MSA's confidentiality provisions were partly designed to protect against. Plaintiff has stated the CFR's definition above but then contorted it into a different concept regarding information that would disclose a protectable property interest. But the dictionary definition is simple; if the fisherman has an interest in the observer information that can be protected, the MMPA itself requires Defendant to protect it under § 1387(d)(8) and (9).

Plaintiff argues that the reports required under § 1387(e) render all information related to those types of information public.[2] This request to drastically limit MMPA confidentiality is unsupported and illogical. Even if disclosure of, for example, a permit

---

[2] Separate from the MMPA provisions at issue, Defendant notes that FOIA exemption 4 would protect trade secrets and commercial or financial information obtained from a person that is privileged or confidential. 5 U.S.C. § 552(b)(4).

holder's description of a take is not confidential, that does not mean that another description of the take must be released, although it is different information in a different document, collected and submitted by a different individual from a different perspective and with different background and resources, and falling squarely within the statute's confidentiality. If the document in question is not a report made under § 1387(e), that subsection does not apply to it.

Plaintiff's similar argument that even confidential information must be released in a form that avoids the prohibited disclosure is inapposite with regard to imagery. Imagery cannot be aggregated or summarized, and the only processing that can remove its ability to identify is obscuring the image with pixelation or a solid color. This error in Plaintiff's logic underlies Plaintiff's repeated misuse of the "Cyr email," which was internal, non-binding guidance applicable only to data. It was not relevant to imagery, and the presumptions in question could not override reasonable conclusions that the information described (including date, time, and location of take, which themselves suffice to ID a vessel with current technology) would disclose the identity or business of a person.

For these reasons, Plaintiff's ambiguous arguments for release of "photo metadata[3]" must fail, though Defendant notes the information they seek (date, fishery, location) is found in different forms throughout these FOIA releases and in the technical publications regarding incidental catch. Plaintiff's quibble, perhaps, is that the latitude and longitude were redacted, but as stated previously, disclosing that information along with the

---

[3] The original photos of marine mammals at issue in this case did not contain metadata of fishery names, gear type, or location. 2nd Ferdinand Declaration at ¶ 13.

accompanying interaction date would make the entire confidentiality provision ineffective with regard to incidental take, where the interests of confidentiality are strongest. Providing such precise information would have the same effect as listing the vessel name for each incident as individuals could use easily accessible information to reidentify the information intended to be confidential.

Similarly, redaction of identifying information in the incident spreadsheets was necessary - they contained information such as latitude and longitude, NMFS area, tracking information for specimens, haul number, cruise number, and information regarding the observer's deployment and vessel identifier.[4] Defendant redacted this information because it provides sufficient information to determine the identity of the vessel or observer, using other public information such as AIS data and fleet information.

Plaintiff's conflation of the MSA and MMPA withholding statutes may be due to the variety of duties performed by groundfish observers. The MMPA does not mandate observer coverage for the North Pacific groundfish trawl fisheries, since they are all Category II or III in the annual List of Fisheries published by Defendant. See <u>List of Fisheries for 2024</u>, 89 FR 12257, at Table 1 (Feb. 16, 2024); 2nd Ferdinand Declaration at ¶ 2. Instead, the on-board observers were stationed on groundfish trawl vessels under the MSA, even though they also served a variety of roles collecting information to support Defendant's management and responsibilities under the MSA, MMPA, and other law. The controlling authority of the MSA is supported by the fact that the funding for

---

[4] See 2nd Ferdinand Declaration at ¶ 14-15.

the observers comes 100% from fees collected from the commercial fishing industry. See 2nd Ferdinand Declaration at ¶ 1. The MSA authorizes Defendant to establish an observer program and unlike the MMPA expressly authorizes Defendant to collect fees from the commercial fishing industry to fund those observers. See 16 U.S.C. § 1862(a)(1), (2) (the North Pacific Fishery Management Council may recommend, and NMFS may adopt, "a fisheries research plan for any fishery under the Council's jurisdiction except a salmon fishery which . . . requires that observers be stationed on fishing vessels . . . ," and that plan may contain a system of fees "to pay for the cost of implementing the plan"). Defendant has established that fisheries research plan, which contains a program that provides for 100% observer coverage for some fisheries and partial observer coverage and electronic monitoring in others. See 50 C.F.R. §§ 679.50–.57; https://www.fisheries.noaa.gov/alaska/fisheries-observers/north-pacific-observer-program (last visited Aug. 7, 2025). Each year, Defendant collects fees from the commercial fishing industry to cover the costs of implementing that plan or the industry directly pays them to the observer provider companies. For example, the North Pacific Observer Program 2023 Annual Report explains that for fishery sectors with full observer coverage (*i.e.*, 1-2 observers on every vessel), the "full coverage observer providers are permitted by NMFS and contract observer services directly with vessels and processing plants," which, for 2023, cost over $11 million. See North Pacific Observer Program 2023 Annual Report at pp. 18, 27 (Table 2-7), available at https://repository.library.noaa.gov/view/noaa/66036 (last visited on Aug. 6, 2025). In the National Observer Program's FY2022 annual report, the MSA is identified as the sole

*Oceana v. National Marine Fisheries Service*  Page 10 of 19
Case No. 3:24-cv-00279-KFR

Case 3:24-cv-00279-KFR   Document 40   Filed 08/25/25   Page 10 of 19

authority for placing observers in the North Pacific Groundfish Observer Program. (See pp. 20-21, https://www.fisheries.noaa.gov/s3//2024-09/Natl-Observer-Program-NOP-FY22-Annual-Report.pdf).

While an MSA observer may sometimes collect information to support data gathering and take-reduction efforts under the MMPA, this limited relation of some observer imagery to the MMPA cannot be used as a waiver of protections put in place, by the MSA under which they are commissioned, for MSA information that is less probative for MMPA purposes. Doing so would significantly harm the confidentiality protections of the MSA, and would severely damage Defendant's ability to obtain voluntary cooperation from commercial fishing participants with additional information-gathering efforts. Defendant has long held that reconciling the provisions of these statutes requires care and consideration of the entire picture, and of how their terms are met in practice. Where, as here, an image taken by an MSA observer is provided for MMPA purposes, the only method of applying the MSA and the MMPA together is to release the mammal imagery component and withhold the fishery component. See 2nd Ferdinand Declaration at ¶ 6, 12. The former is useful for showing the condition of the mammal and lacks the qualities of other protected information, while the latter is useful mainly for its identifying information, and has limited value for minimization of incidental catch, particularly when significant data is otherwise provided in reports and publications on each event.

## 2. The redactions are required under the MSA.

The plain language of the Magnuson-Stevens Act's confidentiality provision prohibits the public release of photographs taken by observers deployed under the Act, which includes the 1,248 records that Defendant withheld in this case. 16 U.S.C. § 1881a(b)(2). Given the information that Defendant makes publicly available concerning the date of marine mammal and fishery interactions, location, species, and fishing practices and gear involved, and given the online information concerning the vessels and participants of commercial fisheries, there exists a real risk that release of imagery depicted in the photographs taken by the on-board observers would result in the disclosure of the identity of a person or business. As Defendant has articulated, disclosure of much of this pixelated information could directly or indirectly reveal the identities of the photographs' subjects, their vessels, or other sensitive information. Therefore, it was proper of Defendant to withhold this information under the confidentiality provisions of the MSA and Exemption 3.

Plaintiff misinterprets Defendant's recently-updated MSA confidentiality provisions. The rulemaking process makes clear that the new regulatory definition of "confidential information" excludes only limited types of information regarding marine mammal encounters: "the date, time, and location of interactions, the type of species, and the fishing practices and gear involved provided that information regarding fishing practices and gear would not constitute a trade secret under [FOIA]." Proposed Rule, 89 Fed. Reg. 17,358, 17,367 (March 11, 2024) ("For these reasons, NMFS proposes in § 600.10 that the definition of ''confidential information'' exclude the following observer information

on marine mammal protected species interactions: species of each marine mammal incidentally killed or injured; the date, time, and geographic location of the take; and information regarding fishing practices and gear used in the take that would not constitute a trade secret under FOIA…"). Further, the Final Rule publication clearly noted that imagery is not treated the same as information that must be submitted to Take Reduction Teams (TRTs) to support their efforts, and while Defendant will continue to release imagery of marine mammal injury/mortality events, it will do so after applying all necessary redactions to prevent disclosure of information protected under MSA confidentiality provisions - images were not being excluded from the "confidential information" definition. Final Rule, 89 Fed. Reg. 10,2001, 102,011 (Dec. 17, 2024).

      Plaintiff argues in passing that the information Defendant redacted could have been released under Section 402(b)(3) of the MSA, which allows Defendant to release confidential information "in any aggregate or summary form which does not directly or indirectly disclose the identity or business of any person who submits such information." 16 U.S.C. § 1881a(b)(3). Plaintiff dwells on the words "who submits such information," but furnishes scant support for reading these words to create a loophole whereby Defendant could reveal sensitive information about observed vessels in defiance of obvious congressional concern with the "identity or business" of *fishery participants*. The underlying purpose and policy of the observer confidentiality provisions—to facilitate reliable and effective data gathering, *see Oceana v. Locke*, No. CIV.A.08-1881 (PLF), 2010 WL 2363940, at *3 (D.D.C. May 18, 2010)—counsel in favor of interpreting "submit[ters]" of observer information to include regulated parties who comply with

observer coverage requirements. Plaintiff further insists that because it is not seeking such confidential information as vessel names or persons' faces, disclosure of confidential information is not possible. But Defendant has explained why the redacted information could lead to indirect disclosure of persons' identities or business.

The risk of indirect disclosure can be best illustrated by an example of such an occurrence. In April 2021, an unredacted non-Defendant image of a marine mammal incidental catch was posted in multiple places on the internet - most notably on the "Anchorage" and "Fishing" forums of Reddit,[5] with a subject line and comments from the poster seeking to identify the vessel or participants, or obtain similar information, based on the background contextual clues shown. See 2nd Ferdinand Declaration at ¶ 10. The image had no names or faces, but posters discussed the many ways one could investigate the issue, using vessel features, AIS locations, photo metadata, and other forums, and eventually named a company[6] based on imagery of vessel features alone. These Reddit forums were not dedicated toward such activities, but groups on Facebook such as "STOP Alaskan Trawler Bycatch" also show motivation and awareness of tools for similar investigations, as well as threats of violent action against trawlers and their crew. Public investigations based on contextual vessel information and public/crowdsourced information are a foreseeable result of Plaintiff's requested relief,

---

[5] See https://www.reddit.com/r/anchorage/comments/mqji61/looking_for_information_on_crew_or_boat_do_you/ and https://www.reddit.com/r/Fishing/comments/mqjjv7/deleted_by_user/; See also 2nd Ferdinand Declaration at ¶ 9-10.

[6] NMFS will neither confirm nor deny here whether the named company was accurate.

via disclosure of indirectly identifying features, with the resulting harm of the loss of confidentiality of this information. See 2nd Ferdinand Declaration at ¶ 5, 11.

Multiple cases cited by Plaintiff on the issue of indirect disclosure are unhelpful or outdated. See Willamette Indus., Inc. v. United States, 689 F.2d 865 (9th Cir. 1982) (finding no clear error by the lower court in holding the agency's inability to predict risk of disclosure and argument it was impossible to know what information might indirectly disclose an identity were not supportive of the exemption); Rosenfeld v. U.S. Dep't of Just., 57 F.3d 803, 813 (9th Cir. 1995) (finding disclosure of a police officer's first name was "not likely to identify the party" because any attempt would be "impractical"); and Scarlett v. Off. of Inspector Gen., No. 21-819, 2023 WL 2682259 (D.D.C. Mar. 29, 2023) (the agency's insufficiently-specific declaration stated the redacted information was "email information" and "would directly or indirectly disclose the identities of the OIG complainant"). The first two decisions were written before the modern internet existed. The Scarlett case is actually supportive of Defendant's position, holding that the disclosure of "information that might identify the complainant, third-party witnesses, or OIG employees," exemption 6 requirements would be met. Id. at 10, citing Horvath v. U.S. Secret Serv., 419 F. Supp. 3d 40, 47, 48 (D.D.C. 2019) ("Just as disclosure of a name or email address can constitute an unwarranted invasion of personal privacy, the disclosure of "information about facts and events that would identify the speaker" can cause precisely the same harm" (internal quotation marks omitted)); Dep't of Air Force v. Rose, 425 U.S. 352, 380 (1976) (Exemption 6 case noting that "what constitutes identifying information ... must be weighed not only from the viewpoint of the public, but

also from the vantage of those who would have been familiar ... with other aspects of [the relevant individual's] career"). Defendant here has clearly shown the risk of indirect disclosure with predictions, assessments, and examples.

The fact that Defendant has, as Plaintiff states, released small batches of unredacted images in the past does not enjoin them from redacting photographs to a greater extent in the future. Different results occurred in some cases here because some imagery was determined by Defendant to be non-confidential. The change to the pixelation processing method with greater redaction of backgrounds occurred in part due to the need for greater efficiency in processing Plaintiff's voluminous requests for imagery, and partly due to changing understandings of what constitutes an indirect disclosure of the identity or business of a person as technology and investigatory resources advanced (and with the recently-noted example of the social media investigation noted above). Redactions are tailored to the level of appropriateness suitable in a given case. It is indeed consistent for Defendant to follow the underlying policy established by the MSA when redacting different kinds of records, as they did in this case. Therefore, the records in this case were properly withheld in line with the requirements of the MSA and under Exemption 3.

### C. Defendant Reasonably Segregated All Non-Exempt Information

Defendant's discretion in withholding information that was not covered by an exemption, as well as its methods employed in doing so, were both proper. Again, given the information that Defendant makes publicly available, independent of FOIA, concerning the date of marine mammal and fishery interactions, location, species, and fishing practices and gear involved, and given the online information concerning the

vessels and participants of commercial fisheries, there exists a real risk that release of imagery depicted in the photographs taken by the on-board observers would result in the disclosure of the identity of a person or business. Moreover, contrary to Plaintiff's contention that there are between 188 and 211 vessels using trawl gear and fishing for groundfish in the North Pacific (Dkt. 27 at 7, 23), the number is between 114 and 138, depending on the year. 2nd Ferdinand Declaration at ¶ 4. Plaintiff's number is incorrect because it may not have accounted for the fact that several vessels participate in multiple trawl fisheries; and there are certain fishery sectors that have much smaller numbers. For example, the pollock catcher-processor sector in the Bering Sea / Aleutian Islands management area has only 13 vessels participating. Id. Similarly, the "Amendment 80 sector" consists of only 14-20 vessels that harvest six species of non-pollock groundfish. Id. Thus, to the extent that one could use imagery to narrow down the vessel to a particular sector, the risk of disclosure increases. Factors relevant to such sleuthing include whether the fishing gear is bottom or pelagic trawl, the color schemes of the vessel, the color schemes of the deck, the type and style of the decking, the species of fish caught and depicted on board, and the number of crew on board.

    It is not possible to release purely visual media such as photographs in aggregate or summary form, and it is well established that agencies have no requirement to create new records in response to requests received under the FOIA. See Nat'l Sec. Couns. v. CIA, 969 F.3d 406, 409 (D.C. Cir. 2020), Aguiar v. DEA, 992 F.3d 1108, 1113 (D.C. Cir. 2021). For these reasons, Defendant individually and carefully redacted portions of the pictures, using an appropriate pixilation method in doing so, and endeavored to leave

remaining the portion that depicted the deceased marine mammal. To the extent that Defendant's instructions and supervision of the redaction process may have potentially withheld more non-confidential material than it potentially could have, it was reasonable for them to do so based on the voluminous amount of records and time-consuming amount of work at issue. See Covington v. McLeod, 646 F.Supp.2d 66, 72 (D.D.C. 2009) (quoting Mays v. Drug Enf't Admin., 234 F.3d 1324, 1327 (D.C. Cir. 2000); See also 2nd Ferdinand Declaration at ¶ 16-17 (noting a hazard of leaving context unredacted, and the threat of penalties for staff errors). Defendant therefore acted reasonably in its discretion to primarily focus on providing the most relevant non-exempt materials in these records: the requested mammal images.

Defendant's efforts to release reports and data, among others, demonstrate that it has met its obligations under the MMPA to provide certain information to the public. Moreover, even though not required to do so, Defendant created a spreadsheet to assist Plaintiff in correlating the photographs Defendant had in its records to the data included in the report on human-induced mortality and injury. See Ex. 4 to 2nd Ferdinand Declaration. It is therefore disingenuous for Plaintiff to suggest that it did not receive information relating to the date, type of interaction, species killed or injured, and the general geographic location of the incident – indeed, Defendant has gone out of its way to provide as much information as possible on these details. Rather, only confidential observer information, prevented from disclosure under the boundaries of the MSA, was withheld, using the most selective and narrowly-tailored method available via Adobe Photoshop pixelation. In doing so, Defendant reasonably segregated and released as

much non-exempt information from the responsive records as possible in line with the requirements of the FOIA.

For the above reasons, Defendant respectfully requests that the Court grant its Motion for Summary Judgment (Dkt. 23) and deny Plaintiff's Cross-Motion for Summary Judgment (Dkt. 27).

RESPECTFULLY SUBMITTED this August 25, 2025, in Anchorage, Alaska.

Michael J. Heyman
United States Attorney,

/s/ E. Bryan Wilson
Assistant U.S. Attorney
United States of America

**CERTIFICATE OF SERVICE**
I hereby certify that on August 25, 2025,
a true and correct copy of the foregoing
was served electronically on the following:

Rumela Roy (*pro hac vice*)
EARTHJUSTICE
rroy@earthjustice.org

Andrea A. Treece (*pro hac vice*)
EARTHJUSTICE
atreece@earthjustice.org
*Attorneys for Plaintiff*

/s/ E. Bryan Wilson
Office of the U.S. Attorney