# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| OCEANA, INC., <br><br> Plaintiff, <br><br> v. <br><br> NATIONAL MARINE FISHERIES SERVICE, <br><br> Defendant. | CASE NO. 3:24-cv-00179 (SLG) |

## SECOND DECLARATION OF JENNIFER FERDINAND

Pursuant to 28 U.S.C. § 1746, I, Jennifer Ferdinand, declare and state as follows:

1. The observer program covering the groundfish trawl sector is commissioned under Section 313 of the Magnuson-Stevens Act (MSA), and that is consistent with historical practice. The cost of the observer program is paid by fishery participants in accordance with MSA regulations, and it is MSA regulations only that require observers to be on board vessels in the groundfish trawl fisheries at issue in this case. The Marine Mammal Protection Act (MMPA) plays no part in the authorization, deployment, or funding of the observer program covering these fisheries. The final rule implementing the observer program is at 77 FR 70062 (https://www.federalregister.gov/d/2012-28255/) (Groundfish Fisheries of the Exclusive Economic Zone Off Alaska and Pacific Halibut Fisheries; Observer Program - 2012) – Amendments 86 and 76 for BSAI/GOA Groundfish FMPs. Attachment 1 is the National Observer Program FY 2022 Annual Report, and shows the funding and authority sources on pages 20-21.

2. In accordance with the MMPA, NMFS publishes annually a list of fisheries organized by how much monitoring is required under the MMPA. Only two of Alaska's groundfish trawl

fisheries are Category 2 fisheries: Bering Sea and Aleutian Islands (BSAI) flatfish and BSAI pollock. Category 2 fisheries are not automatically required to carry an observer under the MMPA, but only upon request under 50 CFR 229.7(c), and there has been no such request either currently or for the timespans of the observer information relevant to this FOIA request. Observation of the North Pacific groundfish trawl fisheries occurs because it is required by MSA implementing regulations at 50 C.F.R. 679.50-57, particularly 50 CFR 679.51(a)(2)(i). All other groundfish trawl fisheries are Category 3 fisheries, which do not require observers under the MMPA. The 2024 List of Fisheries may be found at 89 FR 12257, and lists for other years may be found at https://www.fisheries.noaa.gov/national/marine-mammal-protection/marine-mammal-protection-act-list-fisheries (last accessed August 21, 2025).

3. Limited numbers of vessels participate in AK groundfish trawl fisheries. In 2024, NMFS estimated 29 total participants in the AK Bering Sea and Aleutian Islands flatfish trawl fishery, and 116 in the Pollock trawl fishery. For the period 2018-2022, NMFS estimates may be seen by month and vessel type. As shown by these large fluctuations, it is not uncommon for the groundfish trawl fleet in the entire Bering Sea and Aleutian Islands area to be as few as 20 Catcher-Processors and single-digit numbers of Catcher vessels in a given month. These low numbers mean that the pool of possible identities of a vessel is smaller to start with, and vessels may be easier to compare and identify using imagery and location information. Attachment 2 is the Stock Assessment and Fishery Evaluation Report For The Groundfish Fisheries Of The Gulf Of Alaska And Bering Sea/Aleutian Islands Area, at 83-85 (Tables 4.21 and 4.22).

4. Contrary to Oceana's contention that there are between 188 and 211 vessels using trawl gear and fishing for groundfish in the North Pacific (Br. at 7, 23), the true number is between 114 and 138, depending on the year. Oceana's calculation does not account for the fact that several

vessels are counted more than once, as they are participants in multiple trawl fisheries. Once specific fishery sectors are identified, as they are in records of incidental catch of marine mammals, numbers of vessels to consider are much smaller. For example, the pollock catcher-processor sector in the Bering Sea / Aleutian Islands management area has only 13 vessels participating, throughout the year, and that number might be smaller on a given day or month. See Attachment 2 at 83-85 (Tables 4.21 and 4.22; this sector represented by the rows showing vessel numbers for "AFA CP" (American Fisheries Act Catcher-Processors)); NMFS's internal Catch Accounting System confirms 13 participants currently. Similarly, the "Amendment 80 sector" consists of only 14-20 vessels that harvest six species of non-pollock groundfish. Attachment 3 is the April 1, 2025 BSAI Amendment 80 Program Review, and shows participation numbers on pages 33 and 85.

5. Background contextual information can indicate the fishery or sector a vessel is engaging in. If the imagery released allowed the viewer to identify that the take occurred by a large vessel, or that the vessel involved fish processing on board or fish sorting on deck, the viewer would be able to narrow down the options to the Amendment 80 sector which has about 18 vessels because only Amendment 80 vessels are permitted to fish flatfish in the Bering Sea and only 18 of them operated in 2022. See *Id*.

6. NMFS has worked closely with vessel owners and operators to provide them with sufficient assurances of information confidentiality, ownership, and care to allow observers to carry NMFS-issued cameras and gather imagery only using these cameras. This ensures that imagery can be collected, and that the images are federal records and are data submitted to the Secretary of Commerce. This information is communicated to observers by NMFS in observer training and included in the observer sampling manual. On information and belief, this working relationship would be harmed if the redactions applied in this case are removed, and the resource could be lost.

The North Pacific Observer Program is in regulation at 50 C.F.R. 679.50-57, and the final rule for its initial implementation is at 77 FR 70062 (https://www.federalregister.gov/d/2012-28255/) (Groundfish Fisheries of the Exclusive Economic Zone Off Alaska and Pacific Halibut Fisheries; Observer Program - 2012 - Amendments 86 and 76 for BSAI/GOA Groundfish FMPs).North Pacific Observer Sampling Manual - Pages 2-9 and 14-8 (https://www.fisheries.noaa.gov/resource/document/north-pacific-observer-sampling-manual)

7. NMFS tried to accommodate Oceana's requests beyond FOIA requirements by creating a spreadsheet to correlate images with the data on human-induced mortality and injury events that NMFS published along with its report on that topic. Attachment 4 is one such example of these spreadsheets. The 2022 Technical Memorandum entitled "Human-caused mortality and injury of NMFS-managed Alaska marine mammal stocks" may be found as Attachment 5.

8. Public information exists on the location of each vessel at each point in time. This data is typically collected as Automatic Identification System (AIS), and is available by subscription, such as at VesselFinder.com. This data is highly precise and can be used to track a vessel's location as far back as its tracking goes. Fishing vessels and commercial vessels over 65 feet operating in US navigable waters are required by the U.S. Coast Guard to use AIS, under 33 C.F.R. 164.46(b). Attachment 6 is an image of a sampling of AIS data from a public database that is available to anyone at no cost, and demonstrates the volume, precision, and identification value of AIS tools. Attachment 7 an example of the user-friendly mapping software that some AIS source use to provide vessel location information, identification, and links to historic data and other relevant data.

9. In 2021, NMFS was contacted about whether it was responsible for the potentially unlawful disclosure of a photograph of killer whale take that appeared on a website where a member of an

online community was trying to identify the vessel and crew depicted in the unredacted context of the image. After an internal investigation, NMFS determined that this picture did not come from one of its observers or from a government-issued camera; rather, it was mostly likely taken by a crew member on board. Attachment 8 contains the statement NMFS released addressing the situation.

10. Social media posts show that groups of people opposed to trawl fishing or dismayed by incidental catch are acutely aware of the tools available for vessel identification and tracking, and are occasionally provided direct recordings from individuals who seek out vessels. Posts involving trawl vessels occasionally draw comments that contain calls to violence, including calls to shoot, bomb, sabotage, sink, or violently confront vessels, gear, or people. Posts and comments on Reddit discussed methods of identifying vessels and/or crew from just contextual clues in background imagery that showed vessel features, gear, and individuals' bodies and clothing. This resulted in one company name being posted as an answer to the identity question. Attachments 9-13 show examples from Facebook of use of AIS tools to gather vessel names related to fishing activities, and various calls for violence are among the comments in each example. Attachments 14-16 show the posts and discussion from Reddit regarding identifying a vessel and/or crew from indirect information. Attachments 17 and 18 show portions of the webpage html code with the timestamp of the postings in the Anchorage and Fishing subforums, respectively, showing that they are close in time and relate to the same imagery, though the Fishing subforum post now has the image and title deleted. Attachment 19 shows the portion of the webpage html code with the timestamp for the comment asserting a company name, which was within 2 days of the posting of this unexpectedly identifying photo.

11. Safety concerns raised by the examples noted above implicate other NOAA duties such as requirements that any fisheries research plan adequately consider the safety of observers and fishermen, as required by 16 U.S.C. 1862(b). NMFS does not currently have a plan in place to address any such safety concerns that might arise from a significant change in understanding of what information is protected by the MSA, or how much risk or frequency of indirect disclosure of identities or business must be accepted to comply with the FOIA standards Oceana has presented.

12. While the North Pacific Fishery Observer Program is instrumental in aiding NMFS to produce annual reports of human-caused mortality and injury of NMFS-managed marine mammals, the program observers are not trained marine mammal observers. Observers are provided with guides to help them document interactions with marine mammals and trained to record information that supports NOAA's Marine Mammal Laboratory in identifying the species involved, the severity of injuries, and their causes. NMFS provides them with government-issued digital cameras and requests that they take pictures of fishery interactions with marine mammals. There is no statutory or regulatory requirement that they do so, but the photographs allow NMFS to properly identify the species, analyze the initial determination of injury and cause, and potentially aid in criminal or civil enforcement actions. Most of the records that are in dispute here (those with pixelated redactions) were taken by those cameras, though a small number of images (without pixelated redactions) came from other sources. Attachment 20 is the 2025 North Pacific Observer Program Sampling Manual, and discusses the sensitivity of cameras on page 48 (page 2-9).

13. The original photos of marine mammals at issue in this case did not contain metadata of fishery names, gear type, or location.

14. NMFS released redacted observer records in IR1 to NOAA # 2024-000011 (filename patterns "KW Observer Record [dates]_Redacted" and "[dates]_Redacted"). These redactions were limited to the following information: Vessel Name, Observer Cruise Number, Observer Name, Vessel Permit Number, Haul Number, and the portion of the specimen number that repeated the Haul number that contained one of the above identifiers. These information types are all either direct identifiers or, for cruise and haul numbers, information that would allow easy correlation with other public information such as historic vessel location and fishing duration to accurately identify a vessel or person. These records occasionally contain observer comments that describe vessel procedures or characteristics that narrow the scope of vessels to which it might refer. These redactions were all made to comply with the MSA prohibition on releasing information that directly or indirectly discloses the identity or business of a person, and releasing them would make such a disclosure. Attachment 21 is an example of a compilation of observer records with the described redactions. Attachment 22 is an example of a single observer record with the described redactions.

15. NMFS also released spreadsheets and reports of marine mammal interaction data in IR1 to NOAA # 2024-000011, titled:

   a. 2019-2022 KW Fishery Name and Stock ID (except 7-11-2019 and 8-27-2022 PD whales)-Determinations_Redacted.pdf (included as Attachment 23).
   b. 2019-2022 KW MMAP Reports_Redacted.pdf (included as Attachment 24).
   c. 2019-2022 KW UIDs.xlsx - UID_Redacted.pdf (included as Attachment 25).
   d. 2020-2022 KW Fishery Name for 7-11-2019 and 8-27-2022 PD whales_Redacted.pdf (included as Attachment 26).
   e. 2023 Killer whale MMAP reports_Redacted.pdf (included as Attachment 27).
   f. 2023 KW UIDs_Redacted.pdf (included as Attachment 28).

   The redactions in these documents were for:
   i. Latitude/Longitude coordinates
   ii. Haul Join (a unique record identifier comprised of the observer cruise number and the haul number)

      iii. Cruise Number (identifies a specific observer over a period of time referred to as a "cruise")
      iv. Haul Number
      v. NMFS Area
      vi. Permit
      vii. Haul Sequence
      viii. Personally Identifying Information of the vessel owner/operator or permit holder
      ix. Vessel name/identifier
      x. Time of interaction

Since the dates of the interactions are public, release of precise location information provides sufficient information for anyone to identify the vessel in each interaction in the record, using AIS and other information as described above. Some of these redacted items also specify region, gear type, and target species, along with time and date, which can similarly significantly narrow the scope for any investigator. These redactions were all made to comply with the MSA prohibition on releasing information that directly or indirectly discloses the identity or business of a person, and releasing them would make such a disclosure.

16. In the course of reviewing some original and redacted photos during this litigation, I have discovered one example of a vessel name shown small and in an unexpected location, which would not have been redacted under an expanded approach requiring the release of non-specialized deck/gear imagery. This would have been an unintentional release of directly identifying information. It demonstrates the hazard, even with regard to direct disclosures, of releasing imagery of commercial fishing operations, structures, and gear outside the bounds of the marine mammal in question. It also demonstrates the degree to which directly identifying information, and information alleged by Oceana to be non-confidential, are inextricably intertwined, and even careful review may not find all necessary redactions if the line-drawing exercise is made more complex. The image in question can be provided for in camera review to demonstrate the issue.

17. Penalties can apply for unauthorized disclosure under the MMPA at 16 U.S.C. 1375 and 16 U.S.C. 1387. Staff reviewing FOIA releases take great care to ensure that releasable material is released, but also to avoid any inadvertent release of protected information.

18. The investigative document redacted under exemption 7 consists of the notes of an interview created during course of investigation related to incidental catch. At the time this was reviewed for the FOIA request in question, this document was labeled "Open – Investigation ongoing."

Pursuant to 28 U.S.C. § 1746, I hereby affirm under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on August 25, 2025

Jennifer Ferdinand
Deputy Director
Alaska Fisheries, Science Center