**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ALASKA**

| | |
|---|---|
| OCEANA, INC.,<br>Plaintiff,<br>v.<br>NATIONAL MARINE FISHERIES SERVICE,<br>Defendant. | Case No. 3:24-cv-00279-KFR |

**ORDER RE CROSS-MOTIONS FOR SUMMARY JUDGMENT**

In this Freedom of Information Act ("FOIA") action, Plaintiff Oceana, Inc. seeks to compel Defendant National Marine Fisheries Service ("NMFS") to release agency records related to the take of marine mammals in North Pacific groundfish fisheries.[1] Before the Court are a Motion for Summary Judgment filed by NMFS at Docket 23 and a Cross-Motion for Summary Judgment filed by Plaintiff at Docket 26. The motions are fully briefed.[2]

In releasing records responsive to Plaintiff's FOIA requests, NMFS redacted information the agency claimed was exempt from disclosure due to confidentiality provisions in the Magnuson-Stevens Fishery Conservation and Management Act ("MSA"). The Court finds that NMFS correctly determined that those confidentiality provisions covered the records at issue in this case. Because NMFS has met its burden to justify the redactions it made pursuant to the MSA and FOIA Exemption 3, NMFS's Motion for Summary Judgment is **GRANTED** with respect to those redactions, and Plaintiff's Cross-Motion for Summary

---

[1] Docket 1.

[2] *See* Docket 27 (Plaintiff's response in opposition to NMFS's Motion); Docket 40 (NMFS's joint reply in support of its Motion and response in opposition to Plaintiff's Cross-Motion); Docket 43 (Plaintiff's reply in support of its Cross-Motion); Docket 29-2 (amicus brief in support of Plaintiff's Cross-Motion filed by the Organized Village of Kake, the Hoonah Indian Association, and the Organized Village of Kasaan).

Judgment is **DENIED** with respect to the same.[3] Furthermore, the parties are **ORDERED** to confer and file a status report regarding the record that NMFS originally withheld pursuant to FOIA Exemption 7(A).

## I. BACKGROUND

### A. Marine Mammal Bycatch in North Pacific Groundfish Fisheries

The North Pacific groundfish fishery is a federal fishery with management areas located in the Gulf of Alaska and in the Bering Sea and Aleutian Islands.[4] Hundreds of commercial fishing vessels catch groundfish in these areas each year, including Pacific cod, sablefish, Alaska pollock, and a variety of rockfish and flatfish species.[5]

In the course of their fishing operations, these vessels sometimes inadvertently catch marine mammals.[6] When caught as bycatch, marine mammals often die or suffer injuries that are likely to result in their death.[7] Vessels operating in North Pacific groundfish fisheries have incidentally killed or injured a variety of marine mammals, including Steller sea lions, ringed seals, humpback whales, and orcas.[8]

One way in which marine mammal bycatch occurs is through entanglement or entrapment in fishing gear.[9] Although marine mammal bycatch can occur in many types of gear, in Alaska it is often associated with gear used in trawling.[10] For example, in recent

---

[3] The Court is authorized to issue dispositive rulings pursuant to the parties' consent to a magistrate judge's exercise of plenary jurisdiction. *See* 28 U.S.C. § 636(c)(1); *Branch v. Umphenour*, 936 F.3d 994, 1001 (9th Cir. 2019).

[4] Docket 26-3 at 2–3; Docket 41-3. Groundfish are generally fish that live on or near the ocean bottom. Docket 26-3 at 3.

[5] Docket 26-4 at 3.

[6] Docket 26-5 at 4 (indicating that from 2016 to 2020, 327 interactions between humans and Alaska marine mammals occurred in the North Pacific and West Coast groundfish fisheries, and that many of those interactions involved entrapment of marine mammals in fishing gear).

[7] Docket 26-5 at 3–5.

[8] Docket 26-6 at 8–9. These and several other affected species are listed as threatened or endangered under the Endangered Species Act. *See ESA Threatened & Endangered Species Directory*, NAT'L OCEANIC & ATMOSPHERIC ADMIN. FISHERIES, https://www.fisheries.noaa.gov/species-directory/threatened-endangered.

[9] Docket 26-7.

[10] *See* Docket 26-6 at 8–9; Docket 26-7; Docket 26-8; Docket 41-5 at 108, 111, 114; Docket 43-2 at 9–12. Trawling is a method of fishing by towing large cone-shaped nets along the seafloor or through the water column. Docket 26-7 at 3.

decades, trawl net entanglements have comprised the majority of reported orca entanglements in the state.[11] In addition, NMFS classifies the flatfish and pollock trawl fisheries in the Bering Sea and Aleutian Islands area as Category 2 fisheries under the Marine Mammal Protection Act ("MMPA"),[12] meaning that these fisheries "occasionally" cause incidental mortality or serious injury to marine mammals.[13]

**B. Fishery Observers in North Pacific Groundfish Fisheries**

To collect conservation and management data in North Pacific groundfish fisheries, NMFS relies on observers stationed on commercial fishing vessels through the North Pacific Observer Program ("NPOP").[14] The NPOP is one of two observer programs administered by NMFS through the agency's Alaska Fisheries Science Center, and one of 18 total regional observer programs in the country.[15] Through the NPOP, NMFS deploys over 400 observers that collectively provide over 46,000 days of data collection each year.[16]

NMFS's authority to place an observer on a commercial fishing vessel can derive from multiple statutes, including the MSA[17] and the MMPA.[18] In practice, regardless of which statute or statutes provide that authority in any particular case, observers are generally tasked with collecting information on catch and bycatch.[19] Indeed, the NPOP provides its observers with a manual that lists a number of data collection objectives and priorities, including recording bycatch, or "takes," of marine mammals.[20] The MMPA defines "take" as "to harass, capture, or kill, or attempt to harass, hunt, capture, or kill any marine mammal."[21] Other objectives and priorities include recording bycatch of species listed under the Endangered

---

[11] Docket 26-7; Docket 26-8.
[12] 16 U.S.C. §§ 1361–1423h.
[13] Docket 26-6 at 2, 8–9.
[14] Docket 43-3 at 8–9; *see also* 16 U.S.C. § 1862(a)(1); 50 C.F.R. §§ 679.50–57.
[15] Docket 41-2 at 9–10.
[16] Docket 41-20 at 30.
[17] 16 U.S.C. §§ 1801–1891d.
[18] *See, e.g.*, 16 U.S.C. §§ 1853(b)(8), 1862, 1881a(a), 1387(d).
[19] Docket 41-2 at 9.
[20] Docket 41-20 at 41.
[21] 16 U.S.C. § 1362(13).

Species Act ("ESA"),[22] and recording fishing effort and catch information.[23] This information "supports a wide range of assessment and monitoring activities" under the MSA, the MMPA, the ESA, and other laws.[24]

### C. Plaintiff's FOIA Requests

Between 2021 and 2023, Plaintiff submitted three FOIA requests to NMFS seeking various types of records pertaining to marine mammal bycatch in North Pacific groundfish fisheries.[25]

#### 1. Request 1 (No. DOC-NOAA-2021-001424)

In April 2021, Plaintiff submitted its first FOIA request, seeking among other things "[p]hotos . . . of all documented human-caused serious injury or mortality of marine mammals in the federal North Pacific groundfish trawl fisheries from 2009 to present."[26] After several meetings regarding the scope of the request, the parties agreed that NMFS would review "[i]mages, including metadata, . . . for confidential information (e.g., vessel name, crewmember faces, etc.)" before releasing them.[27]

NMFS ultimately released six sets of responsive records that included hundreds of photos depicting marine mammals.[28] Some of these photos were unredacted and others were

---

[22] 16 U.S.C. §§ 1531–1544.

[23] Docket 41-20 at 41–42. Recording marine mammal takes is listed as the top priority. Docket 41-20 at 41. In addition, the manual dedicates a full chapter to the collection of data on marine mammal interactions, describing how observers should document these interactions and directing them to take photos of all interactions "and related data points such as carcasses, entanglements . . . , [and] injuries . . . ." Docket 43-4 at 14.

[24] Docket 41-2 at 10–11; *see also* Docket 41-2 at 10 (stating that observer information "supports the management of fisheries and conservation of fish stocks, protected species, and ecosystems throughout the United States").

[25] Plaintiff, a nonprofit advocacy organization dedicated to ocean conservation, sought these records "to advocate for more sustainable fisheries management and to ensure transparency in the development of bycatch reduction measures." Docket 26-12 at 4, ¶ 18.

[26] Docket 24-2.

[27] Docket 24-6 at 2.

[28] Docket 24 at 3–5, ¶¶ 8–10, 12–13, 15; Docket 26-12 at 1–3, ¶¶ 4, 6, 9; *see also* Docket 24 at 9, ¶ 31 (stating that NMFS released 1,196 documents containing over 1,500 images in response to entirety of Request 1). The parties do not identify the precise number of marine mammal photos that NMFS released in response to Request 1. Similarly, Plaintiff does not identify how many of those photos it disputes in this litigation. However, in the administrative proceedings before this litigation, Plaintiff

redacted of information that NMFS claimed was subject to FOIA Exemption 3.[29] Exemption 3 allows an agency to withhold information that is "specifically exempted from disclosure by statute[.]"'[30] For each of the redacted photos, NMFS accomplished its redactions by either (1) placing black-out polygons over the claimed exempt information, or (2) pixelating that information.[31]

In a letter justifying its claims of exemption, NMFS explained that the redactions consisted of "observer information . . . and names/identifying information of commercial fishing vessels."[32] According to NMFS, this information was confidential and prohibited from disclosure under the MSA and was therefore exempt from disclosure pursuant to Exemption 3.[33]

Plaintiff challenged the redactions as excessive.[34] Focusing on the redactions made using the pixelation method, Plaintiff noted that in several photos, NMFS had redacted the entire background and parts of the animal shown. Plaintiff stated that these redactions made it difficult to identify the animal shown and were unnecessary to hide identifying information that the photos might contain.[35] Plaintiff provided NMFS with at least 72 examples of marine mammal photos that it believed had been over-redacted, and asked the agency to reconsider the redactions.[36] NMFS denied Plaintiff's reconsideration request.[37] Plaintiff administratively appealed NMFS's withholding of information in all photos that the agency had released with

---

identified at least 72 "over-redacted" marine mammal photos. *See* Docket 24-12 at 1; Docket 24-13 at 3.

[29] Docket 24 at 5, ¶¶ 12–13, 15.

[30] 5 U.S.C. § 552(b)(3).

[31] NMFS explains that it made its black-out polygon redactions with rudimentary software that is part of Clearwell, the agency's electronic document management system. Docket 24 at 11, ¶ 40. In contrast, NMFS made its pixelated redactions with Adobe Photoshop. Docket 24 at 11, ¶ 41. In responding to some of Plaintiff's past FOIA requests that are not at issue in this case, NMFS had used the black-out polygon redaction method—but not the pixelation method—in releasing photos. Docket 24 at 11, ¶ 40.

[32] Docket 24-9 at 2; Docket 24-10 at 2; Docket 24-11 at 2.

[33] Docket 24-9 at 2; Docket 24-10 at 2; Docket 24-11 at 2.

[34] Docket 26-17; Docket 26-18.

[35] Docket 26-18.

[36] Docket 24-13 at 3.

[37] Docket 24-12.

pixelated backgrounds.[38] The U.S. Department of Commerce denied Plaintiff's appeal.[39]

**2. Request 2 (No. DOC-NOAA-2024-000011)**

In October 2023, Plaintiff submitted its second FOIA request, seeking three categories of records: (1) those "associated with the take of orcas in North Pacific groundfish fisheries from 2019 to present including the observer report, self-report, latitude/longitude coordinates of the take, identification of the fishery involved in the take, and the date and time of the reported take"; (2) those "identifying the stock(s) of orcas for the above described takes, if known, or how the take will be assigned to stock(s) in the absence of identifying information"; and (3) those "describing any genetic information collected that is related to the above described takes."[40]

In response, NMFS released 37 records.[41] These records included partially redacted photos and partially redacted non-photographic observer records (including observer reports and spreadsheets compiling observer-collected data).[42] For at least some of those photos, NMFS accomplished its redactions with the pixelation method, obscuring all information beyond the image of the marine mammal.[43] For the non-photographic observer records, NMFS redacted several types of information, including latitude/longitude coordinates, haul number, permit number, vessel name, and time of interaction.[44] In justifying its redactions to these photos and observer records, the agency again invoked FOIA Exemption 3 with the MSA as the underlying withholding statute.[45]

NMFS's release also included one fully redacted PDF file.[46] In a letter accompanying the release, NMFS stated that this redaction was authorized pursuant to FOIA Exemption

---

[38] Docket 26-19.
[39] Docket 24-13.
[40] Docket 26-20.
[41] Docket 24 at 9, ¶ 31.
[42] Docket 41 at 7–8, ¶¶ 14–15; Docket 41-21; Docket 41-22.
[43] *See* Docket 26 at 20.
[44] Docket 41 at 7–8, ¶¶ 14–15.
[45] Docket 24-20 at 1.
[46] Docket 26-12 at 3, ¶ 13; Docket 26-21.

7(A).[47] Exemption 7(A) allows an agency to withhold "records or information compiled for law enforcement purposes, but only to the extent that the production of such . . . records or information . . . could reasonably be expected to interfere with law enforcement proceedings[.]"[48] The agency did not provide any further details regarding this claim of exemption.

Plaintiff administratively appealed NMFS's withholding of information in the redacted records.[49] The Department of Commerce did not issue a decision on this appeal.[50]

**3. Request 3 (No. DOC-NOAA-2024-000025)**

Also in October 2023, Plaintiff submitted its third FOIA request, seeking "the release of any photos . . . of orca takes in Alaska groundfish fisheries from 2019 to present at the highest resolution available."[51] Plaintiff specified that this request encompassed photos "that depict the animals in the water, within the trawl net or other gear, in mixed-catches, or on-deck with the background imagery visible so the viewer can determine the context and setting of the photo."[52] Plaintiff further asked NMFS to label any responsive records with "the name of the fishery, date, and finest-scale spatial location known including latitude and longitude."[53] In correspondence between the parties regarding the scope of Plaintiff's request, NMFS indicated that it would provide the requested photos with pixelated redactions made pursuant to the MSA's confidentiality provisions.[54] Moreover, NMFS stated that it would not label those photos with the "metadata" Plaintiff had requested due to similar MSA confidentiality

---

[47] Docket 24-26 at 1.
[48] 5 U.S.C. § 552(b)(7)(A).
[49] Docket 24-27.
[50] Docket 26 at 20; Docket 24 at 9, ¶ 30. FOIA does not expressly require exhaustion; however, it is "generally required as a matter of preventing premature interference with agency processes." *Weinberger v. Salfi*, 422 U.S. 749, 765 (1975). The failure of an agency to respond in a timely manner to an appeal can amount to constructive exhaustion. *See Aguirre v. U.S. Nuclear Regul. Comm'n*, 11 F.4th 719, 725 (9th Cir. 2021); *Pollack v. Dep't of Just.*, 49 F.3d 115, 119 (4th Cir. 1995). NMFS does not raise failure to exhaust as a defense and the Court makes no findings on the merits of this issue.
[51] Docket 26-22 at 1.
[52] Docket 26-22 at 1.
[53] Docket 26-22 at 1.
[54] Docket 26-24 at 2–3.

concerns.[55]

In response to Plaintiff's third FOIA request, NMFS released 15 photos.[56] According to Plaintiff, NMFS redacted "most of the information" in the photos with the pixelation method.[57] In at least some photos, the agency pixelated everything surrounding the marine mammal image and parts of the marine mammal image that showed the gear in which the marine mammal had been caught.[58] In justifying its redactions, the agency once again invoked FOIA Exemption 3 with the MSA as the underlying withholding statute.[59]

Plaintiff administratively appealed NMFS's withholding of information in the redacted records.[60] The Department of Commerce did not issue a decision on this appeal.[61]

**D. Procedural History**

In December 2024, Plaintiff commenced this action by filing a FOIA complaint against NMFS.[62] Plaintiff alleges that NMFS violated FOIA by unlawfully withholding (1) information from records that are not exempt from disclosure under FOIA Exemptions 3 or 7(A) and that are responsive to Plaintiff's FOIA requests, and (2) reasonably segregable portions of any exempt records that are responsive to Plaintiff's FOIA requests.[63] In other words, Plaintiff alleges that NMFS both redacted non-exempt information from responsive records that contained no exempt information at all, and over-redacted information from responsive records that contained some exempt information.

The parties now cross-move for summary judgment on Plaintiff's claims.

//

//

---

[55] Docket 26-24 at 2–3. NMFS also noted that labeled photos did not already exist and that the agency would therefore need to create a "new product" to comply with this aspect of Plaintiff's FOIA request. Docket 26-24 at 3.
[56] Docket 24 at 8, ¶¶ 25–26; Docket 24-22; Docket 24-26.
[57] Docket 26 at 21.
[58] Docket 26 at 21.
[59] Docket 24-22 at 1.
[60] Docket 24-28.
[61] Docket 26 at 21–22; Docket 24 at 9, ¶ 30.
[62] Docket 1.
[63] Docket 1 at 30–31, ¶¶ 83–91.

## II. LEGAL STANDARDS

### A. Summary Judgment

Federal Rule of Civil Procedure 56(a) directs a court to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A fact is "material" if it might affect the outcome of the case under the governing law.[64] A dispute is "genuine" as to a material fact if there is sufficient evidence for a reasonable fact-finder to decide in favor of the nonmoving party.[65] When considering a motion for summary judgment, a court views the facts in the light most favorable to the non-moving party and draws "all justifiable inferences" in the non-moving party's favor.[66] When parties file cross-motions for summary judgment, a court "evaluate[s] each motion separately, giving the nonmoving party in each instance the benefit of all reasonable inferences."[67]

The party moving for summary judgment bears the ultimate burden of persuasion and the initial burden of producing evidence that shows the absence of a genuine issue of material fact.[68] Where the moving party would not bear the burden of proof at trial, that party "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial."[69] If the moving party successfully carries its burden of production, the nonmoving party "must produce evidence to support its claim or defense."[70] "If the nonmoving party fails to produce enough evidence to create a

[64] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.").
[65] *Id.* at 248.
[66] *Id.* at 255.
[67] *ACLU of Nev. v. City of Las Vegas*, 466 F.3d 784, 790–91 (9th Cir. 2006) (quotation marks and citation omitted); *see also Pintos v. Pac. Creditors Ass'n*, 605 F.3d 665, 674 (9th Cir. 2010) ("Cross-motions for summary judgment are evaluated separately under [the] same standard."); *Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 532 (9th Cir. 2011) ("[T]he court must consider each party's evidence, regardless under which motion the evidence is offered.").
[68] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).
[69] *Nissan Fire & Marine Ins. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).
[70] *Id.* at 1103.

genuine issue of material fact, the moving party wins the motion for summary judgment."[71]

### B. FOIA

"FOIA 'was enacted to facilitate public access to Government documents.'"[72] FOIA's "basic purpose . . . is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed."[73] In FOIA, Congress "sought 'to reach a workable balance between the right of the public to know and the need of the Government to keep information in confidence to the extent necessary without permitting indiscriminate secrecy.'"[74] To that end, FOIA "establishes a judicially enforceable public right to secure access to government records," while also "contemplat[ing] that some information may legitimately be kept from the public."[75]

FOIA "requires an agency to provide requested records unless they fall within one of nine exclusive statutory exemptions."[76] A district court reviews de novo an agency's decision to withhold records.[77] When an agency responding to a FOIA request withholds records on the basis that the records are exempt from disclosure, the agency "has the burden of showing

---

[71] *Id.* at 1102.

[72] *Ctr. for Biological Diversity v. Dep't of Agric.*, 626 F.3d 1113, 1116 (9th Cir. 2010) (quoting *Dep't of State v. Ray*, 502 U.S. 164, 173 (1991)).

[73] *Nat. Lab. Rels. Bd. v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978).

[74] *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989) (quoting H.R. Rep. No. 1497, 89th Cong., 2d Sess., 6 (1966)).

[75] *Rojas v. Fed. Aviation Admin.*, 941 F.3d 392, 396 (9th Cir. 2019) (internal quotation marks omitted) (quoting *Elec. Frontier Found. v. Off. of Dir. of Nat'l Intel.*, 639 F.3d 876, 882–83 (9th Cir. 2010), *abrogated on other grounds by Animal Legal Def. Fund v. Food & Drug Admin.*, 836 F.3d 987, 989 (9th Cir. 2016) (en banc)).

[76] *Pomares v. Dep't of Veterans Affs.*, 113 F.4th 870, 881 (9th Cir. 2024) (citing *Milner v. Dep't of Navy*, 562 U.S. 562, 565 (2011); 5 U.S.C. § 552(b)(1)–(9)); *see also Ctr. for Investigative Reporting v. Dep't of Lab.*, 145 F.4th 1211, 1217 (9th Cir. 2025) (noting that FOIA's disclosure mandate "applies both to information created by the federal government and to records furnished to the government by private parties"). In general, "[w]ithholding is permissible 'only if the agency reasonably foresees that disclosure would harm an interest protected by an exemption' and only after 'consider[ing] whether partial disclosure of information is possible' and taking 'reasonable steps necessary to segregate and release nonexempt information.'" *Transgender L. Ctr. v. Immig. & Customs Enf't*, 46 F.4th 771, 782 (9th Cir. 2022) (quoting 5 U.S.C. § 552(a)(8)(A)). However, the foreseeable-harm requirement does not apply to information properly withheld under Exemption 3. 5 U.S.C. § 552(a)(8)(B); *Leopold v. Dep't of Just.*, 94 F.4th 33, 36–37 (D.C. Cir. 2024).

[77] 5 U.S.C. § 552(a)(4)(B).

that a claimed exemption applies[.]"[78] "Courts must apply that burden with an awareness that the plaintiff, who does not have access to the withheld materials, 'is at a distinct disadvantage in attempting to controvert the agency's claims.'"[79] Moreover, because FOIA establishes a "strong presumption in favor of disclosure,"[80] courts "interpret its exemptions narrowly[.]"[81]

In a case brought pursuant to FOIA, a district court "has jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld."[82] "Most FOIA cases are resolved by the district court on summary judgment, with the district court entering judgment as a matter of law."[83]

**C. The MSA**

In 1976, Congress enacted the MSA in response to concerns about preservation of fishery resources, finding that a "national program . . . [was] 'necessary to prevent overfishing, to rebuild overfished stocks, to insure conservation, to facilitate long-term protection of essential fish habitats and to realize the full potential of the Nation's resources.'"[84] The MSA created eight regional Fishery Management Councils ("Councils") and requires those Councils to prepare, monitor, and review fishery management plans that "will achieve and maintain, on a continuing basis, the optimum yield from each fishery."[85] Fishery management plans and amendments to those plans are subject to approval by the Secretary of Commerce ("Secretary").[86] The MSA further provides for exclusive federal management over fisheries within the exclusive economic zone of the United States.[87]

---

[78] *Pomares*, 113 F.4th at 881.
[79] *Maricopa Audubon Soc'y v. U.S. Forest Serv.*, 108 F.3d 1089, 1092 (9th Cir. 1997) (quoting *Ollestad v. Kelley*, 573 F.2d 1109, 1110 (9th Cir. 1978)).
[80] *Rojas*, 941 F.3d at 406 (quoting *Dep't of State v. Ray*, 502 U.S. 164, 173 (1991)).
[81] *Pomares*, 113 F.4th at 881 (quoting *Dep't of Just. v. Tax Analysts*, 492 U.S. 136, 151 (1989)).
[82] 5 U.S.C. § 552(a)(4)(B).
[83] *Animal Legal Def. Fund*, 836 F.3d at 989.
[84] *Yakutat, Inc. v. Gutierrez*, 407 F.3d 1054, 1058 (9th Cir. 2005) (quoting 16 U.S.C. § 1801(a)(6)); *see also Midwater Trawlers Co-operative v. Dep't of Com.*, 282 F.3d 710, 715 (9th Cir. 2002).
[85] *Yakutat*, 407 F.3d at 1058 (quoting 16 U.S.C. § 1801(b)(4)–(5)).
[86] *See id.* at 1059–60 (citing 16 U.S.C. §§ 1852h(1), 1854(a)(1), (3)).
[87] 16 U.S.C. §§ 1811(a), 1802(11). The exclusive economic zone extends 200 nautical miles seaward from the territorial coast. *See* Exclusive Economic Zone, Proclamation No. 5030, 48 Fed. Reg. 10605 (Mar. 10, 1983).

### D. The MMPA

In 1972, Congress enacted the MMPA "in response to [its] concern that marine mammal species and population stocks were in danger of extinction and depletion due to human activity."[88] The MMPA addresses this concern by "generally prohibit[ing] any individual from 'taking' a marine mammal, defined as harassing, hunting, capturing, or killing it,"[89] and by authorizing civil and criminal penalties for unlawful take.[90] There are several exceptions to the take prohibition, including incidental take "in the course of commercial fishing operations."[91]

## III. DISCUSSION

The Court first addresses whether NMFS properly redacted information that the agency asserts was protected by FOIA Exemption 3 or was not reasonably segregable from the claimed exempt material. The Court then addresses NMFS's redaction of information from the PDF file that was produced as part of the agency's response to Plaintiff's second FOIA request.

### A. NMFS Has Met Its Burden to Justify the Redactions It Made Pursuant to Exemption 3.

Exemption 3 "relieves an agency of its obligation to disclose material 'specifically exempted from disclosure by statute[.]'"[92] In determining whether an agency properly applied Exemption 3, a court applies a two-step analysis. The court first asks "whether the statute identified by the agency is a statute of exemption within the meaning of Exemption 3."[93] If the statute at issue qualifies as one of exemption, the court next evaluates "whether the requested information falls within the scope of the withholding statute."[94]

---

[88] *Nat. Res. Def. Council, Inc. v. Pritzker*, 828 F.3d 1125, 1129 (9th Cir. 2016) (citing 16 U.S.C. § 1361(1)).

[89] *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 15 (2008) (citing 16 U.S.C. §§ 1362(13), 1371(a)).

[90] 16 U.S.C. § 1375(a)(1), (b). Only "knowing" violations are subject to a criminal penalty.

[91] 16 U.S.C. § 1371(a)(2)

[92] *Ctr. for Investigative Reporting v. Dep't of Just.*, 14 F.4th 916, 926 (9th Cir. 2021) (en banc) (quoting 5 U.S.C. § 552(b)(3)).

[93] *Hamdan v. Dep't of Just.*, 797 F.3d 759, 776 (9th Cir. 2015) (citing *Cent. Intel. Agency v. Sims*, 471 U.S. 159, 179 (1985)).

[94] *Carlson v. U.S. Postal Serv.*, 504 F.3d 1123, 1127 (9th Cir. 2007) (citing *Minier v. Cent. Intel. Agency*, 88 F.3d 796, 801 (9th Cir. 1996)), *abrogated on other grounds by Animal Legal Def. Fund*, 836 F.3d at 988–89

In justifying its use of Exemption 3 to redact records responsive to Plaintiff's three FOIA requests, NMFS relied exclusively on a set of confidentiality provisions in the MSA.[95] As relevant here, the MSA provides that "[a]ny observer information shall be confidential and shall not be disclosed," except in 12 situations that do not apply in this case.[96] The statute further provides that the Secretary "may" nevertheless "release or make public any such information in any aggregate or summary form which does not directly or indirectly disclose the identity or business of any person who submits such information."[97]

**1. The MSA's confidentiality provisions qualify as an exemption statute.**

Although the parties appear to agree that the MSA's confidentiality provisions satisfy the first step of the Exemption 3 inquiry, the Court begins by addressing this issue because it affects the scope of the analysis at the second step.

Exemption 3 covers statutes that either "(A) require[] that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establish[] particular criteria for withholding or refer[] to particular types of matters to be withheld."[98] Subsection (A) "embraces only those statutes incorporating a congressional mandate of confidentiality that, however general, is 'absolute and without exception.'" Subsection (B), in contrast, "embrace[s] statutes allowing for administrative discretion," provided that the statute limits discretion by either (1) "prescribing guidelines for its exercise," or (2) designating "a particular item or . . . class of items that Congress has deemed appropriate for exemption[.]"[99] Both subsections' "unmistakable thrust . . . is to assure that the basic policy decision on

---

(holding that agency's determination that requested information fell within scope of withholding statute was not entitled to deference).

[95] Docket 24-9 at 2; Docket 24-10 at 2; Docket 24-11 at 2; Docket 24-20 at 1; Docket 24-22 at 1.

[96] 16 U.S.C. § 1881a(b)(2).

[97] 16 U.S.C. § 1881a(b)(3).

[98] 5 U.S.C. § 552(b)(3)(A). The statutes at issue in this case were enacted before October 2009 and are therefore not subject to the additional requirement of the OPEN FOIA Act. *See* 5 U.S.C. § 552(b)(3)(B); OPEN FOIA Act, Pub. L. No. 111-83, § 564, 123 Stat. 2184 (Oct. 28, 2009).

[99] *Long v. Internal Rev. Serv.*, 742 F.2d 1173, 1179 (9th Cir. 1984) (first citing *Am. Jewish Cong.*, 574 F.2d at 628; and then citing *Lee Pharmaceuticals v. Kreps*, 577 F.2d 610, 615 (9th Cir. 1978)); *see also Ass'n of Retired R.R. Workers, Inc. v. R.R. Ret. Bd.*, 830 F.2d 331, 334 (D.C. Cir. 1987) (noting that subsection (B) is "divided into two disjunctive parts").

governmental secrecy be made by the Legislative rather than the Executive branch."[100]

Here, the plain language of the MSA's confidentiality provisions confirms that they are a withholding statute within the meaning of Exemption 3(B). Specifically, the MSA identifies "observer information," a statutorily defined term, as a class of matters to be withheld.[101] By providing that "[a]ny observer information shall be confidential and shall not be disclosed" except in specified circumstances, the MSA "establishes a presumption that [this] information will be withheld."[102] The Secretary may then choose to release this presumptively confidential information "in any aggregate or summary form which does not directly or indirectly disclose the identity or business of any person who submits such information."[103] This language "indisputably satisfies the criteria of Exemption 3."[104]

Under FOIA, a court's de novo review of an agency's Exemption 3 claim "ends with the finding that the particular matter sought . . . is covered by the statute . . . ."[105] When a statute presumes that certain information should not be disclosed and then gives an agency

---

[100] *Church of Scientology of Cal.*, 633 F.2d at 1330 (quoting *Am. Jewish Congress*, 574 F.2d at 628); *see also Lessner*, 827 F.2d at 1335 ("Whether information is exempt from disclosure is a Congressional determination, not an administrative one." (citing *Iron & Sears v. Dann*, 606 F.2d 1215, 1220 (D.C. Cir. 1979), *cert. denied*, 444 U.S. 1075 (1980))).

[101] 16 U.S.C. § 1802(32); *see also Ass'n of Retired R.R. Workers*, 830 F.2d at 334 (noting that "particular types of matters to be withheld . . . consist of highly specific, limited categories of information" (internal quotation marks omitted)).

[102] *Lessner*, 827 F.2d at 1336 (involving Export Administration Act, then codified at 50 U.S.C. § 2411(c)(1) and which provided in relevant part that "information obtained for the purpose of consideration of, or concerning, license applications under this Act shall be withheld from public disclosure unless the release of such information is determined by the Secretary [of Commerce] to be in the national interest" (emphasis added)).

[103] 16 U.S.C. § 1881a(b)(3); *see also id.* (adding that "[n]othing in this subsection shall be interpreted or construed to prevent the use [of presumptively confidential information] for conservation and management purposes by the Secretary"). As previously mentioned, the MSA also enumerates several exceptions where this presumption does not apply, *see* 16 U.S.C. § 1881a(b)(1)(A)–(H), (b)(2)(A)–(C), but none of those exceptions apply in this case.

[104] *Cf. Hamdan*, 797 F.3d at 776 (concluding as much where statute "state[s] that no law shall require disclosure of certain records" (citations omitted)); *see also Ass'n of Retired R.R. Workers*, 830 F.2d at 335) (holding that statute "refer[red] to particular types of matters to be withheld," and therefore fell within ambit of Exemption 3, where it established "a hard mandate against disclosure softened by an allowance for discretion to be exercised").

[105] *Ass'n of Retired R.R. Workers*, 830 F.2d at 335; *see also Long*, 742 F.2d at 1182 ("[D]e novo review . . . serve[s] the congressional purpose of assuring that any particular nondisclosure decision was the product of legislative rather than executive judgment." (footnote omitted)).

discretion to release that information under limited circumstances, the agency's decision whether to exercise that discretion lies beyond the scope of the court's de novo review.[106] This is because such a statute creates no duty to release the designated information that Congress has clearly "inten[ded] to exclude."[107] Thus, assuming that the information at issue here is presumptively confidential "observer information" within the meaning of the MSA, the Court's de novo review under Exemption 3 may go no further.

//

//

//

//

---

[106] *Cent. Platte Nat. Res. Dist. v. Dep't of Agric.*, 643 F.3d 1142, 1147–48 (8th Cir. 2011); *Ass'n of Retired R.R. Workers, Inc.*, 830 F.2d at 336. The Court acknowledges that in *Long v. Internal Revenue Service*, the Ninth Circuit held that de novo review extended to the IRS's discretionary determination under the Economic Recovery Tax Act, 26 U.S.C. § 6103(b)(2) (1982), whether the disclosure of "standards used or to be used for the selection of returns for examination, or data used or to be used for determining such standards" would "seriously impair assessment, collection, or enforcement [of the tax laws]." 742 F.2d at 1180–81. As opposed to the MSA, however, the Economic Recovery Tax Act did not create a presumption that this information would be confidential. Instead, the statute allowed for disclosure to be "defeated" if the Secretary of the Treasury made an affirmative impairment determination. *Ass'n of Retired R.R. Workers*, 830 F.2d at 336 (citing *Long*, 742 F.2d at 1180); *see also Long*, 742 F.2d at 1176 n.1 (quoting 26 U.S.C. § 6103(b)(2) (1982)). In other words, the statute in *Long* conferred the agency discretion to "withhold information that would otherwise be available," as opposed to discretion to "disclose information that would otherwise be withheld." *Cent. Platte Nat. Res. Dist.*, 643 F.3d at 1147 (citing *Ass'n of Retired R.R. Workers*, 830 F.2d at 334). Due to this meaningful distinction between the two statutes, the Court finds that *Long* does not require review of the Secretary of Commerce's decision whether to release "observer information" pursuant to § 1881a(b)(3). *See Ass'n of Retired R.R. Workers*, 830 F.3d at 336 (explaining that "a fundamental difference in the context of FOIA between the exercise of agency discretion to *withhold* information that will otherwise be available to the public and the exercise of discretion to *disclose* information that *must* otherwise be withheld" is that "[t]he public has a clear interest in statutory procedures that will ensure the propriety of any withholding of information but not in challenging the propriety of its release"); *see also Lessner*, 827 F.2d at 1336–40 (considering only whether information requested fell within scope of information deemed presumptively confidential under the Export Administration Act, 50 U.S.C. § 2411(c)(1) (1987), where statute allowed but did not require disclosure of presumptively confidential information if Secretary of Commerce determined that "the release of [such] information . . . [would be] in the national interest").

[107] *Ass'n of Retired R.R. Workers*, 830 F.2d at 336; *Elec. Priv. Info. Ctr. v. Internal Rev. Serv.*, 910 F.3d 1232, 1242 (D.C. Cir. 2018) (rejecting requester's contention that agency was required to determine whether to exercise statutory discretion to disclose otherwise confidential information, in part because agency could "choose not to disclose information" even if preconditions for discretionary disclosure were met (citations omitted)).

### 2. NMFS has shown that the disputed information falls within the scope of the MSA's confidentiality provisions.

The Court next turns to the second step of the Exemption 3 analysis: whether the MSA's confidentiality provisions cover the information at issue in this case.

NMFS contends that the MSA's confidentiality provisions control because the disputed information was collected by fishery observers "stationed on groundfish trawl vessels under the MSA[.]"[108] According to NMFS, these observers were in fact deployed under the NPOP, which is part of a regional fisheries research plan that the agency established pursuant to the MSA.[109] These observers were therefore "commissioned" under the MSA, NMFS argues, and accordingly the MSA's confidentiality provisions apply to the information they collect.[110]

Plaintiff counters that the release of information collected by fishery observers is governed by confidentiality provisions in the MMPA when that information pertains to marine mammal take.[111] The MMPA's confidentiality provisions differ from the MSA's in that they render a narrower category of information confidential and mandate (instead of merely permit) the release of presumptively confidential information in some instances. Specifically, the MMPA deems confidential and prohibits disclosure of "[a]ny proprietary information" collected by observers deployed pursuant to NMFS's statutory mandate to "monitor incidental mortality and serious injury of marine mammals during the course of commercial fishing operations."[112] And even when an observer collects presumptively confidential "proprietary information," the MMPA requires the Secretary to release "any such information in aggregate,

---

[108] Docket 40 at 9.
[109] Docket 40 at 10 (citing 16 U.S.C. § 1862(a)(1)–(2)).
[110] Docket 40 at 9–11.
[111] Docket 26 at 26–27; Docket 43 at 7–14.
[112] 16 U.S.C. § 1387(d)(1)–(2), (8). The MMPA does not define the term "proprietary information." NMFS suggests that the term broadly encompasses observer information in which a permit holder "has an interest . . . that can be protected," such as "information from their vessel that could result in public identification of their vessels and crew, reveal fishing methods and practices, and enable harassment[.]" Docket 40 at 7. However, the Court agrees with Plaintiff that the statutory framework and plain meaning of the term support a narrower interpretation, such as "information in which permit holders have protectable property interests, such as trade secrets." Docket 43 at 14–16 (citing 16 U.S.C. §§ 1387(d)–(f), 1881a(b)(2); *Proprietary*, Black's Law Dictionary (12th ed. 2024); *Proprietary*, Online Etymology Dictionary, https://www.etymonline.com/word/proprietary).

summary, or other form which does not directly or indirectly disclose the identity or business of any person."[113]

To resolve the parties' dispute over which statute's confidentiality provisions control, the Court must discern Congress's intent by "rel[ying] on traditional rules of statutory interpretation."[114] "The analysis begins and ends with the statutory text."[115] When a statute defines a term, courts "must follow that definition, even if it varies from that term's ordinary meaning."[116] Words left undefined "will be interpreted as taking their ordinary, contemporary common meaning."[117]

Because words "necessarily derive meaning from their context,"[118] they must be read "with a view to their place in the overall statutory scheme."[119] "If the language has a plain meaning or is unambiguous, the statutory interpretation inquiry [ordinarily] ends there."[120] But if the statutory language lacks a plain meaning, or if "a plain meaning reading . . . brings th[e] statute into conflict with another statute and disrupts a preexisting network of statutory provisions," a court may use other interpretive aids to discern congressional intent.[121]

Applying these rules here, the Court agrees with NMFS that the MSA is the controlling

[113] 16 U.S.C. § 1387(d)(9).
[114] *POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 112 (2014).
[115] *Powers v. McDonough*, 163 F.4th 1162, 1191 (9th Cir. 2025) (citing *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 251 (2010)).
[116] *Chubb Custom Ins. Co. v. Space Systems/Loral, Inc.*, 710 F.3d 946, 958 (9th Cir. 2013) (quoting *Stenberg v. Carhart*, 530 U.S. 914, 942 (2000)).
[117] *United States v. Flores*, 729 F.3d 910, 914 (9th Cir. 2013) (quoting *Miranda v. Anchondo*, 684 F.3d 844, 849 (9th Cir. 2012)).
[118] *Chubb Custom Ins.*, 710 F.3d at 958.
[119] *Cheneau v. Garland*, 997 F.3d 916, 919 (9th Cir. 2021) (en banc) (quoting *King v. Burwell*, 576 U.S. 473, 486 (2015)); *see also United States v. LKAV*, 712 F.3d 436, 440 (9th Cir. 2013) (explaining that inquiry may include examination of "similar provisions within the statute as a whole and the language of related or similar statutes" (citing *Jonah R. v. Carmona*, 446 F.3d 1000, 1006–07, 1011 (9th Cir. 2006))); *DaVita Inc. v. Va. Mason Mem'l Hosp.*, 981 F.3d 679, 692–92 (9th Cir. 2020) (stating that "the purpose of a statute in its entirety" may inform statutory interpretation).
[120] *United States v. Lillard*, 935 F.3d 827, 833–34 (9th Cir. 2019) (quoting *CVS Health Corp. v. Vividus, LLC*, 878 F.3d 703, 706 (9th Cir. 2017)).
[121] *Kenai Peninsula Borough v. State of Alaska*, 612 F.2d 1210, 1213 (9th Cir. 1980) (first citing *Train v. Colo. Pub. Int. Res. Grp., Inc.*, 426 U.S. 1, 9–10 (1976); and then citing *Church of Scientology of Cal.*, 612 F.2d at 420–422)). Other potentially relevant interpretive aids include legislative history, *LKAV*, 712 F.3d at 440, and any "longstanding" agency practice, *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386 (2024) (quoting *Nat. Lab. Rels. Bd. v. Noel Canning*, 573 U.S. 513, 525 (2014)).

statute with respect to the information at issue in this case. The MSA's confidentiality provisions cover any information collected by observers deployed under the authority of the MSA, even when that information may also serve the purposes of the MMPA. And here, there is no genuine dispute of material fact that the information at issue was collected by NPOP observers, who are deployed pursuant to the MSA.[122]

**i. The MSA's confidentiality provisions apply to any information collected by fishery observers deployed under the MSA.**

The Court begins by examining the MSA's text to determine whether it has a plain meaning. The MSA creates a presumption against disclosure of "[a]ny observer information,"[123] and defines "observer information" as

> any information collected, observed, retrieved, or created by an observer or electronic monitoring system pursuant to authorization by the Secretary, or collected as part of a cooperative research initiative, including fish harvest or processing observations, fish sampling or weighing data, vessel logbook data, vessel or processor-specific information (including any safety, location, or operating condition observations), and video, audio, photographic, or written documents.[124]

The MSA further defines an "observer" as "any person required or authorized to be carried on a vessel for conservation and management purposes by regulations or permits under this chapter."[125]

---

[122] *See generally* Docket 24; Docket 41. This high-level characterization of the disputed information is sufficient to resolve whether that information falls within the scope of the MSA. *See Fitzgibbon v. Cent. Intel. Agency*, 911 F.2d 755, 761–62 (D.C. Cir. 1990) ("Exemption 3 differs from other FOIA exemptions in that its applicability depends less on the detailed factual contents of specific documents; the sole issue for decision is the existence of a relevant statute and the inclusion of withheld material within the statute's coverage." (quoting *Ass'n of Retired R.R. Workers*, 830 F.3d at 336)). For this reason, the Court rejects Plaintiff's contention that the evidence NMFS submitted in this case does not provide sufficient detail to review the justification for its withholdings. *See* Docket 43 at 5–7; Docket 26 at 23–25.

[123] 16 U.S.C. § 1881a(b)(2).

[124] 16 U.S.C. § 1802(32).

[125] 16 U.S.C. § 1802(31); *see also* 16 U.S.C. § 1802(5) (defining "conservation and management" as "all of the rules, regulations, conditions, methods, and other measures (A) which are required to rebuild, restore, or maintain, and which are useful in rebuilding, restoring, or maintaining, any fishery resource and the marine environment; and (B) which are designed to assure that . . . irreversible or long-term adverse effects on fishery resources and the marine environment are avoided").

The MSA's presumption of confidentiality for "observer information" embraces the entire scope of information collected by NPOP observers, including information related to marine mammal take. The definition encompasses "*any* information collected, observed, retrieved, or created by an observer . . . ."[126] The definition then uses the word "including" to introduce a wide variety of examples: "fish harvest or processing observations, fish sampling or weighing data, vessel logbook data, vessel or processor-specific information (including any safety, location, or operating condition observations), and video, audio, photographic, or written documents."[127] The expansive words "any" and "including" suggest that Congress intended this list to be illustrative rather than exhaustive.[128] Although information related to marine mammal interactions is not expressly identified in the list of examples, the broad statutory language gives no indication that Congress meant to exclude this information from the definition of "observer information." In addition, the repetition of the word "[a]ny" in § 1881a(b)(2) suggests that Congress intended for the presumption of confidentiality to cover all information collected by fishery observers stationed under the MSA, without limitation.[129] For these reasons, the Court concludes that the MSA's confidentiality provisions have a plain meaning with respect to their scope: they apply to any information collected by fishery observers that are required or authorized to be carried on a vessel pursuant to the authority of

---

[126] 16 U.S.C. § 1802(32) (emphasis added).

[127] 16 U.S.C. § 1802(32).

[128] *See United States v. Herrera*, 974 F.3d 1040, 1048 (9th Cir. 2020) (noting that Ninth Circuit has recognized presumption that "the word *include* does not ordinarily introduce an exhaustive list" (first quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 132 (2012); then citing *United States v. Wyatt*, 408 F.3d 1257, 1261 (9th Cir. 2005); and then citing *United States v. Hockings*, 129 F.3d 1069, 1071 (9th Cir. 1997))); *Burgess v. United States*, 553 U.S. 124, 131 n.3 (2008) ("[T]he word 'includes' is usually a term of enlargement, and not of limitation." (internal quotation marks and citation omitted)); *United States v. Gonzales*, 520 U.S. 1, 5 (1997) ("Read naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'" (quoting Webster's Third New International Dictionary 97 (1976))); *Olympic Forest Coal. v. Coast Seafoods Co.*, 884 F.3d 901, 906 (9th Cir. 2018) (recognizing Supreme Court and Ninth Circuit case law interpreting "any" as being "broad and all-encompassing" (first citing *United States v. Williams*, 514 U.S. 52, 531–32 (1995); then citing *Lockett v. Ericson*, 656 F.3d 892, 898 (9th Cir. 2011); then citing *Barker v. Riverside Cnty. Off. of Educ.*, 584 F.3d 821, 825–26 (9th Cir. 2009); and then citing *Ivers v. United States*, 581 F.2d 1362, 1373 (9th Cir. 1978))).

[129] *See Oceana, Inc. v. Locke*, Civ. Action No. 08-1881, 2010 WL 2363940, at *3 (D.D.C. May 18, 2010) (determining that purpose of MSA's presumption of confidentiality for observer information is to ensure observers are candid).

the MSA.

Plaintiff nevertheless suggests that the MSA's confidentiality provisions do not apply in these circumstances because the MMPA is "the more appropriate statute through which to evaluate confidentiality of [observer] information regarding marine mammal bycatch."[130] Plaintiff reasons that the MMPA directly regulates marine mammal bycatch, whereas the MSA does so only indirectly.[131] Plaintiff further maintains that regardless of which authority NMFS uses to station an observer on a commercial fishing vessel, observers collect this information for MMPA purposes and the information is "primarily relevant" and in fact used "to ensure compliance with the MMPA."[132] Specifically, Plaintiff points out, NMFS uses information collected by NPOP observers to support its obligations under the MMPA to (1) prevent depletion of marine mammals from incidental take in the course of commercial fishing, (2) prepare stock assessments for marine mammal populations, and (3) classify fisheries based on their risk of incidentally taking marine mammals.[133]

Although Plaintiff's preferred interpretation might best accord with the MMPA's general objectives, it is difficult to square with the text of the pertinent MMPA and MSA provisions. The Court views the MMPA's confidentiality provisions as providing a framework through which to evaluate the confidentiality of information collected by observers stationed pursuant to the authority of 16 U.S.C. § 1387(d). The MMPA treats confidential "[a]ny proprietary information" collected "under" § 1387(d), which authorizes the Secretary to deploy observers as part of a "program to monitor incidental mortality and serious injury of marine

[130] Docket 43 at 12.

[131] Docket 43 at 8, 12. Plaintiff correctly observes that the MSA's definition of "bycatch" concerns only "fish," and that the statute's definition of "fish" expressly excludes marine mammals. 16 U.S.C. § 1802(2), (12). The conservation of marine mammals nevertheless plays a significant role in fishery management. *See, e.g.*, 16 U.S.C. §§ 1802(5) (defining "conservation and management" to include measures required or useful to rebuild, restore, or maintain "the marine environment"), 1853(a)(1) (requiring that fishery management plans "contain the conservation and management measures" that are "consistent with . . . any other applicable law").

[132] Docket 43 at 8–12.

[133] Docket 43 at 8–10 (citing 16 U.S.C. §§ 1386(a), 1387(c), (f)). Plaintiff also notes that observer information pertaining to marine mammal bycatch informs the development of take reduction plans where such plans are required, and that the take reduction planning process requires public involvement. Docket 43 at 13 (citing 16 U.S.C. § 1387(f)(1), (f)(6)(D), (f)(7)(B), (f)(8)(B)).

mammals during the course of commercial fishing operations."[134] In addition to granting the Secretary this authority, which is to be used "as necessary," § 1387(d) provides instructions and guidance for determining where and how to deploy observers.[135] Section 1387(d) also provides a list of situations in which the Secretary need not place an observer on a vessel in a fishery, and allows the Secretary to deploy an observer on board a vessel in a fishery that is not designated as having "frequent" or "occasional" incidental take of marine mammals.[136]

These provisions indicate that the overarching purpose of § 1387(d) is to provide a way for the Secretary to attain enough observer coverage for the agency to satisfy its responsibilities under the MMPA. Several other provisions of § 1387(d) lend further support to this conclusion. Pursuant to § 1387(d)(2), observers stationed under the MMPA may record incidental take or bycatch of "other nontarget species," record numbers of marine mammals sighted, and perform "other scientific investigations," "among other tasks." Moreover, in § 1387(d)(8)(D), the statute establishes a limited exception to the general nondisclosure rule for confidential "proprietary information" where that information consists of "scientific information involving fisheries."[137] In these ways, the MMPA envisions observers collecting information beyond that which directly serves the purposes of the observer program. However, the statute does not exclude such information from the reach of its confidentiality provisions. As a result, the MMPA's confidentiality provisions are most naturally read as applying to all information collected by fishery observers deployed pursuant to § 1387(d), as opposed to all information pertaining to incidental marine mammal take that is collected by fishery observers more generally.[138] Plaintiff has identified and the Court is aware of no clearly

---

[134] 16 U.S.C. § 1387(d)(1)–(2). The purposes of this program are threefold: (1) to "obtain statistically reliable estimates of incidental mortality and serious injury"; (2) to "determine the reliability of reports of incidental mortality and serious injury" that commercial fishing vessel owners or operators are required to independently submit; and (3) to "identify changes in fishing methods or technology that may increase or decrease incidental mortality and serious injury." 16 U.S.C. § 1387(d)(1)(A)–(C).

[135] 16 U.S.C. § 1387(d)(3)–(6).

[136] 16 U.S.C. § 1387(d)(7).

[137] 16 U.S.C. § 1387(d)(8)(D).

[138] *See Ardestani v. Immig. & Naturalization Serv.*, 502 U.S. 129, 135–36 (1991) (stating that "[t]he word 'under' has many dictionary definitions and must draw its meaning from its context," and holding that

expressed congressional intent to the contrary.[139]

Having determined that the operative confidentiality provisions in the MSA and MMPA have a plain meaning, the Court must read those provisions in accordance with that meaning because the provisions do not conflict. Interpreting the two sets of provisions consistent with their plain meaning allows them to complement each other by creating a comprehensive scheme for evaluating the confidentiality of information collected by fishery observers. Plaintiff argues that the differences in the statutes' standards could potentially lead to odd results, at least in theory.[140] For example, a photo depicting a marine mammal take might not be confidential when taken by an observer deployed pursuant to the MMPA, yet the same photo would be presumptively confidential when taken by an observer deployed under the MSA. But such a result is not as illogical or inconceivable as Plaintiff suggests, and it is not clearly inconsistent with the statutory scheme.[141]

This is because the MSA grants NMFS considerable flexibility to release information collected by an observer deployed under the MSA when that information relates to the agency's objectives under other marine resources statutes. Notably, the MSA's confidentiality provisions permit the release of presumptively confidential observer information when this information can be made available "in any aggregate or summary form which does not directly

---

"the most natural reading" of disputed statute's meaning prevailed where there was no "clearly expressed" contrary legislative intent).

[139] Relying on 16 U.S.C. § 1854(a)(1), (b)(1), and (c)(1), Plaintiff contends that the MSA "requires consistency with other applicable laws" and that NMFS therefore cannot construe the MSA's confidentiality provisions as applying to observer information that concerns marine mammal take. Docket 43 at 13; *see also, e.g.*, 16 U.S.C. §§ 1853(a)(1)(C), 1862(b)(1)(C) (requiring that fishery management plans be consistent with other applicable laws). However, these subsections pertain only to the contents of fishery management plans and plan amendments, as well as regulations implementing those plans and plan amendments. Although these references to consistency with other laws indicate that fishery management plans and their implementing regulations must comport with the MMPA, the Court is not persuaded that they bear on whether Congress intended the MMPA's confidentiality provisions to apply on a subject-matter basis.

[140] Docket 43 at 12.

[141] *See Chubb Custom Ins.*, 710 F.3d at 958 (stating that courts are "cautioned against following a literal interpretation of a statute that would thwart the overall statutory scheme or lead to an absurd result" (citing *Wilshire Westwood Assocs. v. Atl. Richfield Corp.*, 881 F.2d 801, 804 (9th Cir. 1989))).

or indirectly disclose the identity or business of any person who submits such information."[142] NMFS has used this discretionary authority to release information related to marine mammal bycatch in this case. Furthermore, the MSA's confidentiality provisions instruct that "nothing" in them "shall be interpreted or construed to prevent the use for conservation and management purposes by the Secretary" of presumptively confidential information.[143] These provisions appear to reflect an understanding that fishery observers stationed under the authority of the MSA collect various types of information that can serve multiple purposes, and that this information can be disclosed when appropriate and when consistent with the objectives of other laws, including the MMPA.

The Court therefore concludes that the MSA's confidentiality provisions apply to any information collected by fishery observers deployed on commercial fishing vessels pursuant to the authority of the MSA.

**ii. The disputed information is presumptively confidential "observer information" within the meaning of the MSA.**

The Court next evaluates whether the information at issue in this case—marine-mammal-related information collected by NPOP observers—is "observer information" that the MSA presumes confidential and not to be disclosed. Because the Court has already decided that the MSA's presumption of confidentiality encompasses any information collected by observers deployed pursuant to the authority of the MSA, the only remaining question is whether NPOP observers are in fact deployed under that authority.[144]

Under the MSA, the Secretary may establish and implement regional observer programs to aid in fishery conservation and management.[145] In the North Pacific region specifically, the MSA authorizes NMFS to establish an industry-funded observer program with mandatory coverage in fisheries subject to the North Pacific Fishery Management Council's jurisdiction.[146]

---

[142] 16 U.S.C. § 1881a(b)(2)–(3).
[143] 16 U.S.C. § 1881a(b)(3).
[144] *See* 16 U.S.C. § 1802(31).
[145] *See* 16 U.S.C. §§ 1853(b)(8), 1862, 1881a(a).
[146] 16 U.S.C. § 1862(a).

Pursuant to this express authorization, NMFS issued regulations establishing the NPOP "for the purpose of collecting data necessary for the conservation, management, and scientific understanding of fisheries under the [North Pacific Fishery Management] Council's jurisdiction[.]"[147] These regulations require a certain level of observer coverage in certain groundfish fisheries, and they require that fishery participants pay fees to help fund this coverage.[148]

Unlike the MSA or its implementing regulations, the MMPA does not prescribe levels of observer coverage and it does not authorize the use of industry funds to subsidize any coverage. Rather, the MMPA allows NMFS to place observers on board commercial fishing vessels "as necessary," subject to specified guidelines and priorities, and requires permit holders in Category 1 and 2 fisheries to comply with any request to carry an observer that NMFS may make.[149] There are no Category 1 fisheries and only two Category 2 groundfish fisheries in the North Pacific region, and at no time relevant to this case did NMFS use the mechanism set forth in the MMPA to deploy observers in these or other groundfish fisheries in the region.[150]

The Court thus finds that NPOP observers whose information is at issue in this case are stationed on commercial fishing vessels pursuant to the distinct requirements of the MSA and its implementing regulations, as opposed to NMFS's discretionary authority under the MMPA. Because the information at issue in this case was collected exclusively by NPOP observers, it is presumptively confidential under the MSA. The Court therefore concludes that NMFS has met its burden to justify the redactions it made pursuant to Exemption 3.[151]

---

[147] 16 U.S.C. § 1862(a)(1); 50 C.F.R. §§ 679.50–57; *see also* Docket 41 at 1, ¶ 1 ("The cost of the [NPOP] is paid by fishery participants in accordance with MSA regulations . . . ."). These regulations implement amendments to the fishery management plan for the North Pacific region.

[148] *See* Groundfish Fisheries of the Exclusive Economic Zone Off Alaska and Pacific Halibut Fisheries Observer Program, 77 Fed. Reg. 70062 (Nov. 21, 2012); 50 C.F.R. §§ 679.51(a)(1)(i), (a)(2)(i) (requiring partial or full observer coverage for certain types of vessels in federally managed groundfish fisheries), 679.51(d)(1) (requiring vessels in full observer coverage category to pay for observer services), 679.55 (requiring vessels in partial observer coverage category to pay fees assessed based on ex-vessel value of groundfish landings); *see also* Docket 41 at 1, ¶ 1.

[149] *See* 16 U.S.C. § 1387(c)(3)(B), (d)(2)–(4), (d)(7); *see also* 50 C.F.R. § 229.7(c)–(d).

[150] Docket 41 at 1–2, ¶¶ 1–2; Docket 41-2 at 28–29; Docket 26-6.

[151] This ruling necessarily defeats Plaintiff's claim that NMFS improperly withheld reasonably

### B. The Court Need Not Resolve Whether NMFS Properly Invoked Exemption 7(A) in Redacting One Document in Its Entirety.

FOIA Exemption 7(A) protects "records or information compiled for law enforcement purposes, but only to the extent that the production of such . . . records or information . . . could reasonably be expected to interfere with law enforcement proceedings[.]"[152] To invoke Exemption 7(A), an agency must serve a "law enforcement function."[153] In determining whether such an agency properly applied Exemption 7(A), a court considers whether disclosure of the withheld record "(1) could reasonably be expected to interfere with (2) enforcement proceedings that are (3) pending or reasonably anticipated."[154] An agency "need only make a general showing that disclosure of its investigatory records would interfere with its enforcement proceedings."[155]

In NMFS's opening brief, the agency justified its withholding of one record pursuant to Exemption 7(A) by explaining that the record was "a document compiled during the course of a law enforcement investigation," and that "[t]he ongoing nature of the investigative or enforcement process posed a risk that release of the document could reasonably be expected to interfere with the agency's ability to complete its enforcement functions."[156] To support these vague assertions, NMFS cited only its final action letter in response to Plaintiff's second

---

segregable portions of observer records that the agency redacted pursuant to Exemption 3. Thus, the Court will not separately address that claim.

[152] 5 U.S.C. § 552(b)(7)(A).

[153] *Church of Scientology Int'l v. Internal Rev. Serv.*, 995 F.2d 916, 919 (9th Cir. 1993); *see also Tax Analysts v. Internal Rev. Serv.*, 294 F.3d 71, 77 (D.C. Cir. 2002) ("'[L]aw enforcement purposes' under Exemption 7 includes both civil and criminal matters within its scope. . . . FOIA makes no distinction between agencies whose principal function is criminal law enforcement and agencies with both law enforcement and administrative functions.").

[154] *Citizens for Resp. & Ethics in Wash. v. Dep't of Just.*, 746 F.3d 1082, 1096 (D.C. Cir. 2014); *see also Lewis v. Internal Rev. Serv.*, 823 F.2d 375, 379 (9th Cir. 1987) (holding that an agency must prove that "it is a law enforcement agency, that the withheld documents were investigatory records compiled for law enforcement purposes, and that disclosure of those documents would interfere with pending enforcement proceedings").

[155] *Lewis*, 823 F.2d at 380 (citing *Robbins Tire & Rubber Co.*, 437 U.S. at 224–25); *see also Shannahan v. Internal Rev. Serv.*, 672 F.3d 1142, 1150 (9th Cir. 2012) (discussing cases upholding agency's reliance on Exemption 7(A) in withholding documents related to law enforcement investigation).

[156] Docket 23 at 19.

FOIA request.[157] Although the agency also provided a declaration from Deputy Director Jennifer Ferdinand, that declaration provided no additional insight as to the agency's application of Exemption 7(A) to the withheld record.[158]

In NMFS's subsequent brief, the agency continued to maintain that it had properly invoked Exemption 7(A) in withholding the disputed record.[159] The agency provided a second declaration from Deputy Director Ferdinand in which she described the withheld record as "notes of an interview created during [the] course of [an] investigation related to incidental catch," and stated that the record had been labeled "Open – Investigation ongoing" when it was reviewed in connection with Plaintiff's second FOIA request.[160] At the same time, NMFS represented in its brief that this investigation had since ended and that the agency would release the disputed record "with partial redactions for remaining protected information."[161]

The Court assumes that NMFS has followed through with its agreement to release portions of the disputed record that are no longer protected by Exemption 7(A). Provided that is the case, the Court need not decide whether the agency properly invoked that exemption in the first instance. However, NMFS also signaled that it intended to withhold portions of the law enforcement record pursuant to Exemption 3 and the MSA's confidentiality provisions.[162] Because the Court cannot tell whether any redactions to this record remain in dispute, the parties are directed to file a status report that (1) indicates whether any such redactions exist and, if so, (2) proposes a schedule for next steps in this case.

## IV. CONCLUSION

For the foregoing reasons, NMFS's Motion for Summary Judgment at Docket 23 is **GRANTED** with respect to the redactions the agency made pursuant to FOIA Exemption 3. Plaintiff's Cross-Motion for Summary Judgment at 26 is **DENIED** with respect to the same. Finally, the parties are **ORDERED** to confer and file a status report informing the Court

---

[157] Docket 23 at 19 (citing Docket 24-26).
[158] *See* Docket 24.
[159] Docket 40 at 3.
[160] Docket 41 at 9, ¶ 18.
[161] Docket 40 at 3.
[162] Docket 24 at 8 n.1; Docket 40 at 3.

whether a dispute remains as to any redactions to the record that NMFS originally withheld pursuant to FOIA Exemption 7(A). If any redactions remain in dispute, the parties are directed to provide a proposed schedule for next steps. This status report is due no later than **October 15, 2026**.

DATED this 30th day of September, 2026, at Anchorage, Alaska.

*s/ Kyle F. Reardon*
KYLE F. REARDON
United States Magistrate Judge
District of Alaska